39 F.3d 1179
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Shawn FENNER, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Nelson HINES, Defendant-Appellant.
 Nos. 93-5955, 93-5956.
 United States Court of Appeals, Fourth Circuit.
 Argued: Sept. 30, 1994.
Decided: Nov. 15, 1994.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, District Judge. (CR-93-205-JFM)
 ARGUED: Antonio Gioia, Law Offices of Porter & Gioia, Baltimore, Maryland, for Appellant Hines; Thomas Russell Kane, John S. Denholm, JR., Baltimore, MD, for Appellant Fenner. Bonnie S. Greenberg, Assistant United States Attorney, Baltimore, MD, for Appellee. ON BRIEF: William H. Porter, Jr., LAW OFFICES OF PORTER & Gioia, Baltimore, MD, for Appellant Hines; John S. Denholm, Jr., Baltimore, MD, for Appellant Fenner. Lynne A. Battaglia, United States Attorney, Baltimore, MD, for Appellee.
 D.Md.
 AFFIRMED.
 Before WILLIAMS and MICHAEL, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 A jury convicted Shawn Fenner and Nelson Hines of conspiring to distribute crack cocaine, in violation of 21 U.S.C. Sec. 846, and of possessing firearms in connection with drug trafficking, in violation of 18 U.S.C. Sec. 924(c). On appeal both men challenge evidence admitted against them at trial. We affirm their convictions.
 
 I.
 
 2
 At around midnight on April 27, 1993, DEA agents and Baltimore city police arrived to execute a valid search warrant for a row house at 341 Ilchester Street in Baltimore. The officers knocked on the front door and yelled "police" for about ten seconds. After receiving no answer, the officers broke open the door with a ram. As the officers entered the house, they heard a commotion upstairs. In the back upstairs bedroom they found a window wide open, despite the chilly 45 degree temperature outside. The open window led to a porch roof. On the roof the officers found Fenner and Hines lying down, clad only in their underwear. The officers handcuffed the pair and ushered them back inside the house. Next, both men were advised of their Miranda rights. Officers then asked each man where he slept. Hines replied that he slept in the rear bedroom, and Fenner replied that he slept in the front bedroom.
 
 
 3
 Fenner told the officers that they would find a gun and some "pills" in his bedroom. ("Pills" is a street term for crack.) The officers found seventeen small bags of crack in a tray on Fenner's bedroom radiator. A loaded Colt .45 semi-automatic pistol and Fenner's driver's license were in the same tray. The gun bore Fenner's fingerprint. The officers discovered additional crack as follows in Fenner's bedroom: 50.86 grams under the mattress, .535 grams in five plastic bags under the bed, and 80 plastic bags containing small quantities in the closet. All told, officers found more than 60 grams of crack in Fenner's bedroom. Other items of note found there included quantities of plastic bags, a lighter, a razor blade, $1,795 in tens and twenties, a personal pager, and household papers bearing Fenner's name.
 
 
 4
 The search of Hines's bedroom revealed a similar picture. Nearly 60 grams of crack (in 250 separate plastic bags) and a loaded Tauras .357 Magnum revolver were hidden in a stereo speaker. A Glock .9 millimeter semi-automatic pistol was found below the open window leading to the roof. Additional items found in various places in Hines's bedroom included $1,337 (mostly in tens and twenties), an Ohaus digital scale, a personal pager, quantities of small plastic bags, and household papers bearing Hines's name.
 
 
 5
 Several weeks later, while Fenner and Hines remained in the Baltimore City Jail, Detective Fred Certui interviewed each man about an unsolved murder. The men were transported (on writs) on separate days to police headquarters for the interviews. Before beginning any substantive questioning of Fenner, Detective Certui filled out a new "booking sheet" for him. In this process Fenner told Certui his name, nickname (Skip), race, sex, age, marital status, height, weight, complexion, address (1634 N. Washington St.), social security number, parents' names, and education. Fenner said that he was sober and not on drugs. Next, Certui read Fenner his Miranda rights. Fenner signed a Miranda waiver form and allowed Certui to question him. Certui repeated the same process with Hines. Hines, too, waived his Miranda rights. Among other things, Hines told Certui that he (Hines) "used to sell drugs" when he lived at 1634 North Washington Street.
 
 
 6
 At trial in its case in chief, the government called Detective Certui. Certui testified that Fenner supplied him with his nickname, Skip, when Fenner filled out the booking sheet in preparation for the interview at the police department. This testimony assisted in linking Fenner to the house at 341 Ilchester Street where Fenner was found on the roof in his underwear. The name "Skip Fenner" appeared on a receipt, a telephone bill, and a credit card found during the search at 341 Ilchester Street. Certui also testified that Fenner said his address was 1634 North Washington Street. Finally, Certui testified that Hines admitted that he "used to sell drugs" when he lived at 1634 North Washington Street.
 
 
 7
 The government also called Baltimore Police Officer Albert Hall. Officer Hall testified about his encounter with Hines eight months before his arrest in this case. Hall and another officer were on patrol close to midnight on September 2, 1992, and saw a van stopped in the middle of the street with its lights off. Hines was standing outside the van on the passenger's side. When Hines saw Officer Hall, Hines walked toward the rear of the van where he dropped several small plastic bags of cocaine. The jury was told that Hines was arrested and pled guilty in state court to simple possession of cocaine.
 
 
 8
 Neither Fenner nor Hines testified.
 
 II.
 
 9
 Fenner makes two arguments on appeal. First, he says that the district court erred in admitting Detective Certui's testimony about Fenner's answers to the booking questions. According to Fenner, the district court ignored Miranda v. Arizona, 384 U.S. 436 (1966), when it refused to suppress the statements Fenner made prior to waiving his Miranda rights. In particular, Fenner claims prejudice from his answers to the questions about his nickname (Skip) and address (1634 N. Washington St.). Second, Fenner says the district court disregarded Bruton v. United States, 391 U.S. 123 (1968), when (in Fenner's joint trial with Hines) it permitted Detective Certui to testify that Hines admitted that he "used to sell drugs" at 1634 North Washington Street.
 
 A.
 
 10
 Under Miranda police must advise a defendant of his right to remain silent and his right to counsel before each custodial interrogation. Miranda, 384 U.S. at 444. In Rhode Island v. Innis, 446 U.S. 291, 301 (1980), the Supreme Court explained that
 
 
 11
 the term "interrogation" under Miranda refers not only to express questioning but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody ) that the police should know are reasonably likely to elicit an incriminating response from the suspect.
 
 
 12
 (Emphasis added.)
 
 
 13
 Innis 's parenthetical qualifier highlighted above allows police to get "standard identification information" without violating Miranda. United States v. Taylor, 799 F.2d 126, 128 (4th Cir.1986), cert. denied, 479 U.S. 1093 (1987). In other words,
 
 
 14
 the taking of basic personal information such as name, age, and place of birth is a ministerial duty incident to arrest and custody which does not constitute "interrogation or its functional equivalent, 'reasonably likely to elicit an incriminating response.' "
 
 
 15
 Id. (quoting United States v. Morrow, 731 F.2d 233, 237, cert. denied, 417 U.S. 1230 (1984), in turn quoting Rhode Island v. Innis, 446 U.S. at 301-02.) The booking exception is, however, narrow. See, e.g., Pennsylvania v. Muniz, 496 U.S. 582, 601-2 & n. 14 (1990) (acknowledging a "booking exception" to Miranda 's strictures, but noting that "the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions") (citations omitted).
 
 
 16
 We are satisfied that Detective Certui's preliminary inquiries of Fenner fit within the booking exception. Certui got basic identifying information from Fenner to complete a standard booking sheet. Once Certui completed the sheet, he read the attached Miranda warnings aloud to Fenner. Fenner then initialled each warning, signed the general Miranda waiver, and willingly participated in the interview which followed. Under these facts there was no Miranda violation.
 
 B.
 
 17
 Under Bruton v. United States, 391 U.S. 123 (1968), a defendant's Sixth Amendment right to cross-examine witnesses against him is violated when the defendant is inculpated by a non-testifying codefendant's statement admitted at their joint trial. A "codefendant's statement is inculpatory if it could fairly be understood to incriminate the accused." United States v. Campell, 935 F.2d 39, 43 (4th Cir.1991), cert. denied, 112 S.Ct. 348 (1991) (citation omitted). In this case Fenner claims it was error to admit (through Detective Certui's testimony) the following statement of Fenner's non-testifying codefendant, Hines: "I used to live at 1634 Washington Street. Fee [a person unrelated to this case] came to the house once and saw some drugs because I used to sell drugs." Standing alone, Hines's statement does not incriminate Fenner. Therefore, its admission did not violate Bruton. Campell, 935 F.2d at 43.
 
 III.
 
 18
 Hines claims that two items of evidence of bad acts or prior crimes introduced in the government's case in chief should have been excluded under Federal Rules of Evidence 404(b) or 403:(1) his statement to Detective Certui that he (Hines) "used to sell drugs" and (2) Officer Hall's testimony about Hines's possession of cocaine eight months before his arrest in this case. At trial Hines objected, arguing that this was improper propensity evidence, see Rule 404(b), which was in any event inadmissible because its probative value was substantially outweighed by the danger of unfair prejudice, see Rule 403. The district court overruled the objections. Hines's lawyer apparently argued that Hines's presence in the house at the time of the search did not mean Hines knew drugs were there. This led the court to conclude that the challenged testimony was admissible as classic Rule 404(b) evidence tending to show knowledge, intent and absence of mistake or accident.
 
 
 19
 Hines cites United States v. Hernandez, 975 F.2d 1035 (4th Cir.1992), to single out the "used to sell drugs" statement for special attack. In charges arising out of an undercover operation, Ms. Hernandez (who lived in Washington, D.C.) was convicted of conspiracy to distribute and possession with intent to distribute cocaine. At trial a government witness testified that Hernandez told him that she used to sell crack in New York City and knew a special recipe for cooking crack to enhance the quantity. Id. at 1037. We concluded that "Hernandez's 'cooking' recipe and her sale of crack in New York at some indefinite time are in no way connected to the cocaine she is conspiring to sell in this case." Id. at 1041. Thus, finding no connection between the crime charged and the prior bad acts evidence, we decided that admission of the evidence was error that required a new trial.
 
 
 20
 Hines says his statement, "I used to sell drugs," is, just like the one in Hernandez, not connected to the crime he is charged with here. Thus, he says the admission of the statement was error that requires a new trial.
 
 
 21
 We need not decide the admissibility issues raised by Hines. Both of the admissions of evidence he complains about, even if error, were harmless. The jury had before it other, substantial, evidence of Hines's guilt. A brief summary of this evidence illustrates its strength. As the officers arrived to search the house, Hines and Fenner fled to the roof to hide. In Hines's bedroom the officers found 250 bags of crack, a .357 Magnum revolver, a .9 millimeter semi-automatic pistol, an Ohaus digital scale, a pager, a supply of plastic bags, and $1,337 in cash (mostly in tens and twenties). In the face of these facts, admission of testimony about Hines's prior cocaine possession and drug selling could not have affected the jury's verdict. Accordingly, even if the district court erred in admitting the evidence challenged by Hines, the errors were harmless.
 
 IV.
 
 22
 The judgments of the district court are affirmed.
 
 AFFIRMED