**UNITED STATES of America, Appellee,**

**v.**

**Robert Lee MORROW, Appellant.**

**No. 83–5101.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 4, 1983.

Decided April 5, 1984.

Certiorari Denied June 4, 1984. See 104 S.Ct. 2689.

---

George V. Laughrun, II, Charlotte, N.C. (Levine, Goodman & Carr, Charlotte, N.C., on brief), for appellant.

Kenneth P. Andresen, Asst. U.S. Atty., Charlotte, N.C. (Charles R. Brewer, U.S. Atty., Asheville, N.C., on brief), for appellee.

Before MURNAGHAN, SPROUSE and CHAPMAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Robert Lee Morrow was indicted on March 10, 1983 for violating 18 U.S.C. § 2113(a)[1] and (b)[2] (Supp.1983). The charges against Morrow arose from his alleged involvement in the February 16, 1983 armed robbery of a Wachovia Bank branch in Charlotte, North Carolina. On appeal, Morrow raises numerous issues, the resolution of which depends in part on a clear understanding of the day's chaotic events.

Eyewitnesses stated at trial that the bank was robbed by two black males at about 10:40 a.m.; one bank customer pursued the suspects and later gave investigating officers a partial license plate number for the green Chevrolet Camaro used as a get-away vehicle. At about 11:15 a.m., investigating officers Dale Travis and James Alsbrooks found a green Camaro with a corresponding plate number near the apartment complex in which Morrow's girlfriend, Ms. Jeanette S. Cohn, resided.

Having traced the car as registered to Cohn, Travis and Alsbrooks found Cohn in her apartment complex office in the process of paying her rent, and obtained her initial consent to search the residence. When they reached her apartment, however, Cohn abruptly questioned the necessity for the search and said she "wouldn't let" the search proceed. Nevertheless, Morrow himself responded to the officers' knock at Cohn's door, and at that time both he and Cohn were arrested and transported to the Charlotte Law Enforcement Center by Alsbrooks. Although Travis instructed the departing Alsbrooks to obtain a formal search warrant for Cohn's apartment, Alsbrooks ultimately returned at about 1:30 p.m. with a "Voluntary Consent to Search" form signed by Cohn. The subsequent search, conducted under the authority of the voluntary consent, uncovered $4,836.00 (including $1,500.00 in marked "bait money" from the Wachovia Bank) hidden behind a refrigerator, two sawed-off shotguns, plastic gloves, several ski masks (one of which had been partially ground up in the garbage disposal), and cut-off panty hose.

At the Law Enforcement Center later that afternoon, Morrow underwent standard processing, which involved obtaining information for an "M.O. Card." As Alsbrooks completed the card, Morrow initiated a conversation by asking Alsbrooks

---

1. "Whoever, by force and violence, or by intimidation, takes ... from the person or presence of another any property or money ... belonging to ... any bank ... [s]hall be fined not more than $5,000 or imprisoned not more than twenty years, or both."

2. "Whoever takes and carries away, with intent to steal or purloin, any property or money ... of value exceeding $100 belonging to ... any bank ... shall be fined not more than $5,000 or imprisoned not more than ten years, or both ...."

what the search of Cohn's apartment had revealed and what charges would be brought. At first, Alsbrooks refused to respond, but Morrow persisted, emphasizing to both Travis and Alsbrooks that he was willing to talk, but simply "didn't want to sign anything." At that point, Morrow proceeded to make highly incriminating statements to the officers.[3]

Acting against the advice of his attorney, Morrow later agreed to submit to a polygraph test, on the stipulation that test results be admissible at trial. The two-hour test, administered by an FBI agent with seven years of polygraph experience, revealed "deceptive" body responses when Morrow was asked, "Did you rob the Wachovia Bank? " and, "Did you have any part in the robbery of the Wachovia Bank?" Although Morrow's attorney was excluded from the testing session, both a United States Marshal and the FBI Special Agent investigating Morrow's case were permitted to be present.

■ Following his indictment, Morrow filed a motion to suppress all fruits of the search conducted at Cohn's apartment and all statements made by him to the arresting officers on the day of the robbery. The District Court denied the motion in full,

and the case proceeded to jury trial, at which evidence of the polygraph test results was also admitted. On appeal, Morrow alleges that the District Court abused its discretion in denying the motion to suppress the fruits of the warrantless search and the inculpatory statements made by him to the Charlotte police officers. He also argues that the admission of polygraph results constituted clear error.[4]

We turn, therefore, to consideration of the issues of admissibility of the items seized at the apartment, the inculpatory statements made following arrest, and the results of the polygraph test.

### A. Fruits of the Warrantless Search

■ Unquestionably, Morrow is on sound ground in arguing that the better course of action for the investigating officers would have been to obtain a judicially-issued search warrant. Probable cause and adequate time certainly enabled the officers to procure a valid warrant.[5] Nonetheless, the fact remains that, because Cohn's consent to the search was voluntarily given, the items seized were properly admitted.

■ This Court has long recognized that the Government must shoulder the burden

---

**3.** Morrow was especially forthcoming after Alsbrooks informed him that Cohn could be tried as an accessory to the crime. Morrow stated, "Wait a minute, man, I did that.... The girl didn't have nothing to do with that. I robbed the bank myself." He also admitted to having worn gloves and a mask during the robbery and even expressed his intention to plead guilty to the charge.

**4.** Morrow's final allegation, that the trial court erred in denying a mistrial after Alsbrooks stated to the jury that Morrow "had gotten out of prison" some three months before the robbery, is without merit. The trial judge directed the jury "not to consider the fact that he's been in prison in any manner in reaching a decision in this case...." Were the case against Morrow not otherwise so strong, such a direct statement of "other crimes" could perhaps, despite the curative instruction, be deemed to constitute grounds for a mistrial under Federal Rule of Evidence 403 (relevant evidence may be excluded if its probative value is outweighed by danger of unfair prejudice).

When considered against the backdrop of the abundant and cumulative evidence against Mor-

row, however, the effect of Alsbrooks' statement was tenuous at best; indeed, a mere superfluity. As in *United States v. Johnson*, 610 F.2d 194, 196 (4th Cir.1979), *cert. denied*, 446 U.S. 911, 100 S.Ct. 1840, 64 L.Ed.2d 264 (1980), the prosecution "solidly proved its case," and a strong curative instruction was given by the trial judge. Thus, denial of a mistrial was entirely proper. *See also United States v. Murphy*, 696 F.2d 282, 287 (4th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983) (reference to time spent "in the institution" is "troubling," but does not constitute reversible error).

**5.** By 11:30 a.m., the officers had traced the get-away vehicle to Cohn, knew that the car had been followed to the apartment complex by an eyewitness to the robbery, and observed a chrome pistol on the front floorboard of the car. Alsbrooks did not return with the "Voluntary Consent to Search" form until about 1:30 p.m. Two hours should have provided more than sufficient time for Alsbrooks to obtain a warrant, as Travis originally directed.

of proving that an individual " 'freely and intelligently [gave her] unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied.' " *United States v. Vickers*, 387 F.2d 703, 706 (4th Cir.1967), *cert. denied*, 392 U.S. 912, 88 S.Ct. 2069, 20 L.Ed.2d 1369 (1968), *quoting Channel v. United States*, 285 F.2d 217, 219 (9th Cir.1960). Moreover, that burden is a concededly heavy one, since the fourth amendment admits but "few specifically established and well-delineated exceptions" to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).[6] Because the District Judge, considering the totality of circumstances surrounding Cohn's consent, was not clearly erroneous in his factual determination that the consent was truly voluntary, the finding that the fruits of the warrantless search were admissible at Morrow's trial is immune from attack. *Compare United States v. Bethea*, 598 F.2d 331, 335 (4th Cir.1979), *cert. denied*, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979) (appellate court bound by District Court's determination of voluntariness of consent, unless such determination is clearly erroneous).

We recognize that "voluntariness" is a fluid concept, varying with specific surroundings and circumstances: the number of officers present at the time of consent; the subjective state of mind, intelligence, and age of the consenting party; the length of detention; and the individual's knowledge of his or her right to refuse consent.[7] When evaluating these and other such factors in the instant case, the District Court's finding of voluntary consent was well within reason. On the morning of the robbery, Cohn had initially consented to the search of her apartment at the complex office, but then refused consent when she told the officers she "just [didn't] understand why" the search was necessary. Thus, it is clear that Cohn knew she could likewise refuse consent later that afternoon at the Law Enforcement Center, and that she was being asked, rather than ordered, to permit the search.

Although Alsbrooks did tell Cohn at the Center that she could be charged as an accessory and, therefore, punished as a principal, that statement alone hardly amounts to duress or coercion, especially since the record reveals no intellectual or emotional impairment that would render Cohn particularly susceptible to threats or overreaching by investigating officers. Against the hypothetical possibility that Cohn may have been pressured into surrendering a right stands the practical certainty that a warrant was readily attainable. Hence, continued refusal of consent would have gained her nothing and might well have generated antagonism on the part of a policeman put to the performance of a task he regarded as mere "make work."

Finally, Cohn's own explanation, that she had refused consent that morning because she was afraid of what Morrow's reaction might be, rings especially true: once she was removed from the pressure of the sudden and perhaps menacing confrontation at the apartment complex, and given time to reflect, in Morrow's absence, at the Law Enforcement Center, Cohn made an entirely rational and voluntary decision to comply with Alsbrooks's request. Thus, the items seized during the course of the subsequent search were properly admitted against Morrow at trial.[8]

**6.** *See also Robbins v. California*, 453 U.S. 420, 423, 101 S.Ct. 2841, 2844, 69 L.Ed.2d 744 (1981) (although the Supreme Court has identified some exceptions to the warrant requirement, the exceptions are few).

**7.** *See Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968) (a consent allegedly given by an elderly, isolated woman was held invalid as it was obtained only after a group of four investigating officers claimed authority to search under a warrant, thereby implying that she had no right to resist; the situation was "instinct with coercion").

**8.** By deciding that Cohn's consent was voluntary, we have no need to reach the issue whether Morrow (who at times shared the apartment with Cohn) possessed standing to challenge the search. *See, e.g., Sallie v. North Carolina*, 587 F.2d 636 (4th Cir.1978), *cert. denied*, 441 U.S. 911, 99 S.Ct. 2009, 60 L.Ed.2d 383 (1979) (standing to contest search of abode may be established by a showing of regular contributions to

B. *Incriminating Statements Made by Morrow on the Afternoon of the Arrest*

■ Evidence of the statements made by Morrow to Travis and Alsbrooks at the Law Enforcement Center on the afternoon of his arrest were also properly admitted. Although defense counsel attempts to argue on appeal that Morrow, in the face of extensive questioning, repeatedly denied any guilt during his 4½ hour processing period at the Law Enforcement Center, only to succumb finally to prodding by investigating officers, the record presents no evidence that such was the case. Rather, trial testimony reveals that Morrow received his *Miranda* warnings, understood them, and was not subject to custodial interrogation at the time he made his confession, after he himself initiated conversation with Alsbrooks. In short, it was Morrow who decided that he wanted to talk while Alsbrooks completed the M.O. card; Alsbrooks made reasonable efforts first to dissuade him, then to make sure he was aware of his *Miranda* rights;[9] only then did Alsbrooks, in the presence of Travis, agree to speak with Morrow and record his statement.

■ The evidence shows that Morrow's statements were the product of a knowing and voluntary waiver of his rights to avoid self-incrimination and to have an attorney present. We appreciate that the Government must meet high standards to prove a valid waiver of such constitutional rights. Nevertheless it is true that "[a]n express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver." *Mi-*

*randa v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). Morrow made precisely such a waiver.[10] Particularly since the Supreme Court has recently recognized that a question as vague as, "Well, what is going to happen to me now? " may permit a finding that an arrestee "initiated" conversation, we have little difficulty in holding that, by his affirmatively loquacious bearing, Morrow likewise initiated conversation with Alsbrooks, and thereafter waived his right to silence. *See Oregon v. Bradshaw,* — U.S. ——, ——, 103 S.Ct. 2830, 2833, 77 L.Ed.2d 405 (1983).

■ It is important to note that, in taking basic personal information (name, age, place of birth) for the M.O. card, Alsbrooks was merely performing a ministerial duty incident to arrest and custody. His questions to Morrow did not constitute interrogation or its functional equivalent, "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis,* 446 U.S. 291, 301–2, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) ("definition of interrogation extends only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response") (emphasis original). Far from knowing that his routine questions were likely to elicit any but the most routine responses from Morrow, Alsbrooks was understandably taken aback by Morrow's willingness to talk. Having waived his right to silence and to an attorney by his own action, Morrow may not now be heard to complain that statements he made were improperly admitted by the trial court.

rent, occupation, and storing of personal possessions).

9. When Morrow first questioned Alsbrooks about the search and possible charges, Alsbrooks replied, "I can't talk with you further because you've already requested an attorney." After Alsbrooks summoned Travis, Morrow indicated to both officers that he did understand his *Miranda* rights, that he did not want an attorney present, and that he simply did not

want to sign any document the officers might produce.

10. Even acknowledging that the Government's burden of proving waiver is heavier after a suspect has already invoked his right to counsel, Morrow still made the knowing and intelligent waiver contemplated by *Miranda.* He was insistent in his demands to talk with the officers, and they scrupulously reiterated the *Miranda* warnings before speaking with him.

### C. Results of Polygraph Test Administered Upon Stipulation of Admissibility

■ Given the overwhelming weight of the evidence properly admitted (both the items seized from Cohn's apartment and the statements made by Morrow to the arresting officers), we find that admission of the polygraph evidence constituted, at most, harmless error. A survey of current federal and state court holdings on the issue reveals a wide divergence of views as to the admissibility of polygraph materials.[11] The Fourth Circuit has not yet had occasion to consider whether it should break ground to admit such evidence traditionally excluded. We decline to do so now, in the realization that the error, which may well have occurred in the admission of polygraph evidence, was, in all events, harmless.[12]

AFFIRMED.

11. *Compare* a rule of *per se* exclusion of polygraph evidence, even if parties have stipulated to its admissibility, *North Carolina v. Grier*, 307 N.C. 628, 643, 300 S.E.2d 351, 359 (1983) ("the administration of justice simply cannot, and should not, tolerate the incredible burdens involved in the process of ensuring that a polygraph examination has been properly administered"), *with* a rule of discretionary exclusion, *United States v. Oliver*, 525 F.2d 731, 736 (8th Cir.1975), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976) (when defense and prosecution have stipulated as to admissibility, discretionary rather than *per se* exclusionary rule is appropriate; defendant's agreement as to admissibility of test may "be looked upon as a 'deliberate bypass' of his constitutional rights based on an exercise of trial strategy").

12. A finding of error seems particularly likely since the polygraph examination was conducted under prejudicial circumstances. Although both an FBI agent and a United States Marshal were permitted to be present on behalf of the Government during the examination, Morrow's attorney was excluded by the examiner.