870 F.2d 656
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sherman LEWIS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joyce Torian THOMPSON, Defendant-Appellant.
 No. 88-5530.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 4, 1988.
Decided March 2, 1989.
 
 Ronnie Monroe Mitchell (William Trent Fox, Jr., Harris, Sweeny & Mitchell on brief), Robert Dale Jacobson (Jacobson & Bowman on brief) for appellants.
 Joseph Douglas Wilson (Department of Justice, Margaret P. Currin, United States Attorney, on brief) for appellee.
 Before ERVIN, Circuit Judge, BUTZNER, Senior Circuit Judge, and JACKSON L. KISER, United States District Judge for the Western District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Sherman Lewis ("Lewis") and Joyce Torian Thompson ("Thompson") were each tried and convicted on two counts of conspiracy, two counts of armed bank robbery and two counts of using a firearm in the commission of a felony. On appeal, Lewis and Thompson assert that the district court committed reversible error by admitting evidence obtained from Thompson's house and car pursuant to a search consent form signed by Thompson. Finding no merit in Thompson's contentions that her consent was not voluntary and that she was denied the assistance of counsel, we affirm both convictions.
 
 I.
 
 2
 On March 30, 1987, an armed man and a woman robbed the Barclay's Bank near Fayetteville, North Carolina. Surveillance cameras recorded the event. On July 16, 1987, another Fayetteville bank, Southern National, was robbed by an armed man accompanied by a woman. During the course of this robbery, a customer was shot and wounded by the male. Again, surveillance cameras were activated in time to photograph the robbers. Outside the Southern National Bank, investigators found clothes matching the description of those worn by the robbers and a matchbook bearing fingerprints.
 
 
 3
 Using the photographs from the bank surveillance cameras, FBI agents, with the help of local residents, identified Lewis and Thompson as suspects in both the Barclay's and Southern National robberies. After obtaining warrants for their arrest, FBI agents dressed as firemen and lured the couple and three children out of Thompson's house peacefully. Lewis and Thompson were promptly arrested and taken to the Fayetteville Law Enforcement Center ("FLEC").
 
 
 4
 At issue in this appeal are events that transpired at FLEC. On the evening of Thompson's arrest, FBI agents attempted to obtain a warrant to search her car and house. The agents contacted, by phone, a Federal Magistrate in Raleigh. The Magistrate agreed that probable cause for a warrant existed, but, because of the lateness of the hour, declined to issue a warrant until the next day. Also that same evening, Thompson unsuccessfully attempted to contact two partners at a law firm which had represented her in other matters. She eventually reached Christopher Godwin ("Godwin"), an associate at the firm. Godwin agreed to meet her at FLEC the next morning but did not feel authorized to bind the firm to take her case.
 
 
 5
 When Godwin arrived the next morning, he met with FBI agents Mark Mitchell ("Mitchell") and Thomas Becker ("Becker"). They informed Godwin of the evidence against Lewis and Thompson, which at that time consisted of the surveillance photographs and the articles found near the Southern National Bank including the fingerprinted matchbook. They told Godwin that they wished to obtain Thompson's consent to search her house and of their phone conversation with the Magistrate the night before.
 
 
 6
 Godwin was then allowed to confer privately with Thompson. He was also allowed, in the presence of the agents, to show her the surveillance photographs. Godwin testified at the suppression hearing that he repeatedly informed Thompson that she could refuse to give her consent to a search, but that, in his opinion, the FBI could obtain a warrant based on the evidence in their possession. He also told her that he was not her attorney but was merely providing her with legal advice.
 
 
 7
 After Godwin discussed the situation with Thompson, the FBI agents met with Thompson to persuade her to sign a search consent form. This meeting lasted about half an hour and Godwin was present throughout. At one point near the end of the meeting, Thompson and Becker had a brief but somewhat heated exchange in which Becker asked her to make up her mind about the consent so that he could "go home to his kids." Mitchell ended this exchange by instructed Becker to "cool it" and again informed Thompson that she could freely deny consent. At this point, Thompson signed the form and the meeting ended.
 
 
 8
 When the FBI searched Thompson's house and car later that afternoon, they found a good deal of incriminating evidence. The search revealed: (1) an ice chest containing a pistol matching descriptions of the gun used in the bank robberies; (2) a twenty dollar bill that was part of some "bait money" taken from Southern National; (3) a book bag resembling one carried by the robbers; and (4) six hundred dollars in coins.
 
 II.
 
 9
 Thompson and Lewis argue on appeal that Thompson's consent was not voluntary and that the district court erred in refusing to suppress the evidence found as a result of this search. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Since voluntariness is a question of fact, the district court's finding must be upheld unless Thompson demonstrates that it was clearly erroneous or that the court reached its finding by employing an improper legal standard. Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
 
 
 10
 The principles for guiding determinations of voluntariness are well established. As we recently stated:
 
 
 11
 '[V]oluntariness' is a fluid concept, varying with specific surroundings and circumstances: the number of officers present at the time of consent; the subjective state of mind, intelligence, and age of the consenting party; the length of detention; and the individual's knowledge of his or her right to refuse consent.
 
 
 12
 United States v. Morrow, 731 F.2d 233, 235-236 (CA4 1984) (footnote omitted), cert. denied, 467 U.S. 1230, 104 S.Ct. 2689, 81 L.Ed.2d 883 (1984). Careful attention to the events of this case and the factors noted in Morrow, leads to the conclusion that Thompson's consent was voluntary and that it was obtained in a fashion that commends the efforts of the FBI agents involved.
 
 
 13
 Thompson gave her consent the morning after she was arrested. She was provided an opportunity to discuss her situation privately with an attorney of her own choosing, whose advice was thorough and legally correct. She was allowed to inspect critical evidence against her, the surveillance photographs, and was repeatedly informed by both Godwin and the FBI agents that she was free to withhold her consent. This evidence indicates that Thompson was provided with sufficient information about her rights and all relevant circumstances to allow her to make a knowledgeable choice.
 
 
 14
 The evidence further indicates that no efforts were made to make the situation unduly stressful or coercive. With the exception of a brief show of impatience that was quickly reprimanded, the officers were courteous and accommodating to Thompson and the requests of attorney Godwin. Nor does it appear that she was in any way threatened or misled about either the probability that a search warrant could be obtained or about any benefits that might accrue as a consequence of her cooperation.
 
 
 15
 We find no error in the district court's conclusion that Thompson knowingly and voluntarily consented to the search of her house and car. Since the evidence against the pair was properly admitted, we need not reach the merits of Lewis' contention that the court below erroneously denied his standing to seek to suppress the evidence obtained from Thompson's property. See, e.q., United States v. Matlock, 415 U.S. 164, 169, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (voluntary consent of a joint occupant is valid against any co-occupant, permitting evidence obtained in a consensual search to be used against the co-occupant).
 
 III.
 
 16
 Lewis and Thompson raise a final argument about the validity of the sentences imposed below. They argue that it was improper for the district court to impose separate sentences and convictions under 18 U.S.C. Sec. 924(c) and 18 U.S.C. Sec. 2113(d) (armed bank robbery). Section 924(c), which makes it unlawful to use a firearm in the commission of a felony, was at one time inapplicable where the underlying felony provided for enhanced punishment if a dangerous weapon was used. See Simpson v. United States, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978).
 
 
 17
 However, "[s]ix years after Simpson, Congress amended Sec. 924(c) to expressly provide that it applied to felonious crimes of violence including those which imposed enhanced punishment if committed by the use of a deadly weapon. The amendment makes the punishment imposed by Sec. 924(c) for use of a dangerous weapon additional to the punishment imposed for the crime of violence committed by the use of a deadly weapon." United States v. Shavers, 820 F.2d 1375, 1377-1378 (CA4 1987). See also United States v. Pisani, 787 F.2d 71, 73-74 (CA2 1986) (discussing the Comprehensive Crime Control Act of 1984). The sentences below were, therefore, entirely proper and will not be disturbed on appeal.
 
 
 18
 AFFIRMED.