PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

MARVEL JOHNSON PRINCE-OYIBO,
        *Defendant-Appellant.*

No. 02-4104

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CR-01-438)

Argued: January 24, 2003

Decided: February 27, 2003

Before WILLIAMS and KING, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Williams joined. Senior Judge Hamilton wrote a dissent-
ing opinion.

## COUNSEL

**ARGUED:** Matthew Alan Wartel, BYNUM & JENKINS, P.L.L.C.,
Alexandria, Virginia, for Appellant. Eric David Edmondson, Special
Assistant United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON
BRIEF:** Paul J. McNulty, United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

**OPINION**

KING, Circuit Judge:

Marvel Johnson Prince-Oyibo appeals his conviction on one count of travel document fraud. Prior to trial, the Government moved in limine to exclude both the results of Prince-Oyibo's polygraph examination, and evidence that he suffered persecution as a Christian in his predominantly Muslim home country of Nigeria. During the course of the jury trial, the district court granted both portions of the Government's motion, thereby excluding both the polygraph evidence and the evidence of persecution. In his appeal, Prince-Oyibo asserts that the evidentiary exclusions constitute reversible error. For the reasons stated below, we disagree and affirm.

I.

Prince-Oyibo arrived at Dulles International Airport after a flight from Lagos, Nigeria, by way of Amsterdam, on October 26, 2001. At border control, he presented his Nigerian passport, with an enclosed United States non-immigrant B1/B2 tourist type visa foil stamp, to Immigration and Naturalization Service Inspector Warren Blair. Inspector Blair had reservations concerning the authenticity of the visa and referred Prince-Oyibo to secondary inspection for further investigation. The secondary inspector found additional problems with the visa and determined that it was not genuine.

On October 29, 2001, Prince-Oyibo was arrested and was charged by criminal complaint with travel document fraud, to wit, that he "did knowingly use, and attempt to use, a false, forged, counterfeited and altered nonimmigrant visa . . . knowing it to be forged, counterfeited, altered, and falsely made," in violation of 18 U.S.C. § 1546(a). On November 27, 2001, a grand jury in the Eastern District of Virginia returned an indictment charging Prince-Oyibo with the same offense as the criminal complaint.

During Prince-Oyibo's January 30, 2002, jury trial, the Government presented the testimony of forensics examiner Lurline Trizna. Examiner Trizna concluded that, while the passport was genuine and

unaltered and the visa was genuine when issued, various subtle abnormalities indicated that the visa had subsequently been altered. At the conclusion of Examiner Trizna's testimony, the Government introduced a State Department document showing that Prince-Oyibo's visa foil had originally been issued to a Nigerian woman.

At trial, Prince-Oyibo did not challenge the Government's contention that his visa had been altered. Rather, his defense was that he "never intended to get a fraudulent visa"; that his failure to realize the visa had been altered was reasonable; and that his ignorance of the proper procedure for obtaining a visa, coupled with his culture's practice of "paying officials to do what they are supposed to do," prevented him from realizing that his visa was "counterfeit, altered, falsely made or otherwise unlawfully obtained."

Prince-Oyibo took the witness stand at trial to explain the circumstances surrounding his acquisition of the visa. This, he stated, was the first time that he had ever needed a visa. Given his inexperience, he accepted the offer of a friend, Tony Igberi, to assist him. Igberi travelled with Prince-Oyibo to Lagos, where they went to the United States embassy and met a man who appeared to be an embassy employee. The purported embassy employee had previously been given certain documentation (Prince-Oyibo's passport, birth certificate, and bank statements), as well as US $2,045, all of which Prince-Oyibo had brought with him to Lagos. Prince-Oyibo completed a visa application and departed.

Several weeks later, Prince-Oyibo returned to the embassy on the appointed date to receive his visa. An embassy employee handed him both his passport and what he believed to be a legitimate visa. Prince-Oyibo testified that he did not notice any irregularities; nor was he made suspicious by the fact that attainment of the visa had required the payment of such a large sum: he was inexperienced with foreign travel, and, in Nigeria, it is common to have to "tip" officials to do their jobs in a timely fashion. Furthermore, when Prince-Oyibo checked with two airlines (KLM and British Airways) concerning flights to the United States, both airlines indicated that they had confirmed the visa. And when the visa was checked during the Amsterdam stopover of his KLM flight to Dulles, the visa was again

confirmed. Thus, Prince-Oyibo testified, when he presented the visa to Inspector Blair, he believed it to be legitimate.

Prior to trial, Prince-Oyibo had taken and passed a polygraph examination regarding whether he knew the visa to be false, altered, counterfeit, or forged. The test, according to the retired FBI forensic polygrapher who administered it, indicated that Prince-Oyibo was truthful when he stated that he did not know that the visa was illegitimate. Before trial, the Government moved in limine to exclude this opinion from evidence, citing our circuit's per se rule that the results of polygraph tests are inadmissible. On the day of trial, after hearing argument on the Government's motion to exclude Prince-Oyibo's polygraph evidence, the court granted the motion.

Prince-Oyibo also hoped to present evidence showing that he was a prominent Christian in Nigeria and that, as such, he faced persecution from his country's Muslim majority. When asked during his polygraph examination "Did you come to the U.S. as you were afraid for your personal safety because of your religious beliefs?", the test indicated that Prince-Oyibo's affirmative answer was truthful. Prior to trial, however, the Government had also moved in limine to exclude all evidence relating to the defendant's past or future persecution. At the start of Prince-Oyibo's trial, the court withheld judgment on the admissibility of the persecution evidence, in order to "wait and see what you all present to see whether or not [it] becomes relevant." Ultimately, the court found that the persecution evidence was irrelevant to the central issue in the case, that is, "whether [the defendant] got a forged document and knew whether it was forged." Accordingly, the court granted the Government's motion to exclude all evidence of past or future religious persecution.

The sole issue before the jury was whether, "when the defendant used [the] nonimmigrant visa, he knew it was counterfeit, altered, falsely made or otherwise unlawfully obtained" and "did not act because of ignorance, mistake, or accident."[1] The jury convicted Prince-Oyibo, and the court sentenced him to three months in prison

---

[1]The trial court rejected the prosecution's "willful blindness" instruction on the ground that there was insufficient evidence to justify such an instruction.

(which amounted to time already served); two years of supervised release; a fine of $1,000; and a special assessment of $100. Prince-Oyibo filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review rulings on the admissibility of scientific evidence, such as polygraph test results, for abuse of discretion. *United States v. Ruhe*, 191 F.3d 376, 387-88 (4th Cir. 1999). In so doing, we keep in mind that "[a] district court by definition abuses its discretion when it makes an error of law." *United States v. Stitt*, 250 F.3d 878, 896 (4th Cir. 2001) (internal quotation omitted). An abuse of discretion standard also applies to evidentiary issues such as relevancy. *United States v. Ellis*, 121 F.3d 908, 926 (4th Cir. 1997).

## III.

### A.

Prince-Oyibo first contends that the district court's exclusion of his polygraph evidence constitutes reversible error. Though he recognizes that we have previously held polygraph evidence per se inadmissible, he maintains that recent advances in polygraph testing have rendered it sufficiently reliable for admission under the standard enunciated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The error is a reversible one, he maintains, because the polygraph test results reached the critical issue in his case, to wit, whether he was truthful when he stated that he did not know that his visa was false, forged, counterfeit, or altered when he presented it for inspection.

Prior to *Daubert*, this circuit consistently maintained a per se rule that the results of an accused's or a witness's polygraph test are not admissible to bolster or undermine credibility.[2] *See United States v.*

---

[2]The qualification that polygraph evidence is per se inadmissible only if offered "to bolster or undermine credibility" becomes clear through our pre-*Daubert*, *Council Oil* case. There, the Government had offered

*Chambers*, 985 F.2d 1263, 1270-71 (4th Cir. 1993); *United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1134 (4th Cir. 1991); *United States v. Morrow*, 731 F.2d 233, 238 (4th Cir. 1984) (describing polygraph evidence as "traditionally excluded"); *see also United States v. Porter*, 821 F.2d 968, 974 (4th Cir. 1987) (holding that it is impermissible even to mention that a witness has taken a polygraph test); *United States v. Tedder*, 801 F.2d 1437, 1444-45 (4th Cir. 1986) (same). Absent an en banc overruling or a superseding contrary decision of the Supreme Court, we, as a circuit panel, are bound by these precedents. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 n.2 (4th Cir. 2002). The questions before us, then, are two: (1) Did *Daubert* work a change in the law governing the admissibility of expert opinion testimony, such that the viability of per se rules barring admission of polygraph evidence has been thrown into doubt? And, if so, (2) have our post-*Daubert* precedents already resolved the matter by reestablishing this Circuit's adherence to our longstanding per se bar against polygraph evidence? We address these issues in turn.

### 1. The Impact of *Daubert*

The Federal Rules of Evidence provide that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . ." Fed. R. Evid. 702. In *Daubert*, the Supreme Court made clear that it is the duty of the trial court to perform the gatekeeping function with respect to expert testimony: "the *trial judge* must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589 (emphasis added).

---

expert testimony on the credibility of a key Government witness and the trial court had refused to permit cross-examination of the expert concerning the results of a polygraph test taken by the Government witness. We held that the polygraph results should have been admitted as an attack on the basis of the expert's opinion, although not as a direct attack on the credibility of the Government witness himself. *United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991).

The *Daubert* Court announced five factors that the trial court may use in assessing the relevancy and reliability of proffered expert testimony: (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the technique's "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *Id.* at 593-94. Rather than provide a definitive or exhaustive list, *Daubert* merely illustrates the types of factors that will "bear on the inquiry." *Id.* at 593. The analysis must be "a flexible one." *Id.* at 594; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999) (holding that testing of reliability should be flexible and that *Daubert*'s five factors neither necessarily nor exclusively apply to every expert). In short, *Daubert* requires that a trial court give broad consideration to all of the various factors that may illuminate the reliability of proffered expert testimony.

Our per se bar on the admission of polygraph evidence pre-dates *Daubert*. We established our rule pursuant to the "*Frye* test," which, until replaced by *Daubert* in 1993, was for decades the dominant standard governing the admissibility of scientific evidence. *See* Charles Alan Wright & Victor James Gold, 29 *Federal Practice and Procedure* § 6266 (1997). Under *Frye*, scientific evidence was admissible only if it was based on principles generally accepted as valid by the relevant scientific community. *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Though *Daubert* maintained "general acceptance" as one of the relevant factors to weigh in the decision of whether to admit proffered expert evidence, the Court held that the Federal Rules of Evidence require that a district court ultimately resolve questions of admissibility on the basis of a broader assessment of reliability. *Daubert*, 509 U.S. at 589 ("*Frye* made 'general acceptance' the exclusive test for admitting expert scientific testimony. That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials.").

Several of our sister circuits have, in light of the 1993 *Daubert* decision, reexamined the viability of their similar, pre-existing per se rules against the admission of polygraph evidence. In particular, the Fifth and Ninth Circuits have held that *Daubert* effectively overturned

their respective per se bars. Both now leave the admission or exclusion of such evidence to the discretion of the district courts. *See United States v. Cordoba*, 104 F.3d 225, 227-28 (9th Cir. 1997) (remanding for district court determination of whether proffered evidence was admissible under Rules 702 and 403)[3]; *United States v. Posado*, 57 F.3d 428, 432-34 (5th Cir. 1995) (same)[4]; *cf. United States v. Messina*, 131 F.3d 36, 42 (2d Cir. 1997) (noting, post-*Daubert*, that Second Circuit has "not decided whether polygraphy has reached a sufficient state of reliability to be admissible under Rule 702"). As the Fifth Circuit put it, "[a]fter *Daubert*, a per se rule is not viable." *Posado*, 57 F.3d at 433.

At the very least, by reserving the reliability assessment to the district courts, *Daubert* throws into doubt the viability of our per se rule that the results of an accused's or a witness's polygraph test are inadmissible to bolster or undermine credibility. Under one possible interpretation of *Daubert*, the court below should give Prince-Oyibo the opportunity to present evidence in support of his claim of polygraphy's newfound reliability; and, if it is satisfied that polygraphy is indeed today reliable (a matter on which we express no opinion), that court should be free to admit the polygraph test results in evidence. The question remains, however, whether we, as a three-judge panel, are free to adopt such an interpretation today. We turn to that question now.

## 2. Our Intervening Decisions

This circuit has, subsequent to *Daubert*'s announcement of the

---

[3]On remand, the district court in *Cordoba* held that the proffered polygraph evidence was *not* admissible under Rule 702, or, alternatively, that it was inadmissible under Rule 403. *United States v. Cordoba*, 991 F. Supp. 1199, 1208 (C.D. Cal. 1998) (concluding that polygraph evidence generally did not meet the reliability standards of *Daubert*, and noting that, in any event, defects in the test at hand rendered the test inadmissible under Rule 403), *aff'd*, 194 F.3d 1053 (9th Cir. 1999).

[4]After the Fifth Circuit's remand in *Posado*, the district court held that the proffered polygraph evidence was *not* admissible. As in *Cordoba*, the district court relied, in the alternative, on Rules 702 and 403. *United States v. Ramirez*, 1995 WL 918083 (S.D. Tex. Nov. 17, 1995).

new, multi-factored test for admissibility of expert testimony, continued to invoke its longstanding per se rule against the admission of polygraph evidence. *See Ruhe*, 191 F.3d at 388 & n.9 (adhering to "this circuit's per se ban on polygraph evidence"); *United States v. Sanchez*, 118 F.3d 192, 197 (4th Cir. 1997) ("The rule [that polygraph evidence is never admissible to impeach the credibility of a witness] remains . . . in this circuit . . . ."). However, in each instance, we have also noted the change in the law effected by *Daubert*. In both *Ruhe* and *Sanchez*, we suggested that it may be necessary to overturn our longstanding per se rule against admissibility of polygraph evidence, and that en banc consideration may not be required to do so. On the basis of these suggestions, Prince-Oyibo contends that our post-*Daubert* precedents have reserved, rather than resolved, the questions of (1) whether *Daubert* requires that this Circuit change its position on polygraph evidence, and (2) whether a mere panel is free (as panels of the Fifth and Ninth Circuits found themselves to be) to announce that change.

Our consideration of the impact of *Daubert* on this Circuit's per se ban against polygraph evidence is traceable to a suggestion raised in *United States v. Toth*, 91 F.3d 136 (4th Cir. July 31, 1996) (unpublished). There, our unpublished, per curiam opinion noted the Fifth Circuit's decision that, due to the change in the law effected by *Daubert*, en banc consideration was not necessary to overturn that circuit's per se rule against admissibility of polygraph evidence. Nonetheless, we adhered to our pre-*Daubert* precedents and recited the "rule in this Circuit . . . that evidence that an accused or a witness has taken a polygraph test is inadmissible." *Id.* at **4. While we suggested that "we might be inclined to agree with the Fifth Circuit in an appropriate case," we decided that it was "not necessary to reach that issue in Toth's case," because the trial court was within its discretion in excluding the evidence under Rule 403. *Id.* at **5.

A year later, in *Sanchez*, we returned to the *Toth* suggestion, noting that "we recently suggested that it is possible to change our prohibition against polygraph evidence without the approval of the en banc court in light of [*Daubert*]." 118 F.3d at 197 n.3. Nonetheless, we held in *Sanchez* that "[t]he rule [against polygraph evidence] remains . . . in this circuit, and is binding upon us in this case . . . ." 118 F.3d at 197. "[I]n any event," we continued, "we would find any error in

excluding this evidence harmless as having no significant relevance to any material issue going to [the defendant's] guilt." *Id.*

In *Ruhe*, we again took note of the *Toth* suggestion "that a panel could rely upon [*Daubert*] to alter the circuit's law on polygraph evidence." 191 F.3d at 388 n.9. However, as in *Toth* itself, we adhered in *Ruhe* to our per se bar, reasoning that the appellant had "not advanced [the *Toth*] argument and we do not pass upon it." *Id.*

Although both *Ruhe* and *Sanchez* ultimately applied the per se bar, it is nonetheless not immediately clear that either case forecloses the possibility that we, as a panel, might act on the *Toth* suggestion and rely on the *Daubert* change of law to alter our circuit's precedent on polygraph evidence: in *Ruhe*, the panel did not reject the *Toth* suggestion outright, but rather sidestepped the suggestion on the ground that the appellant there had not raised it. By contrast, Prince-Oyibo *has* advanced the *Toth* argument. And while *Sanchez* did come closer to simply rejecting the *Toth* suggestion, it stopped short when it invoked, in the alternative, the doctrine of harmless error. Again by contrast, an error in excluding the polygraph evidence indicating that Prince-Oyibo was telling the truth when he stated that he did not know his visa to be false has significant relevance to a material issue going to the defendant's guilt.

These distinctions notwithstanding, we conclude that, to the extent that *Daubert*'s alteration of the legal landscape threw into doubt the viability of our per se rule against polygraph evidence, *Ruhe* and *Sanchez* effectively resolved those doubts in favor of the rule. In each case, we treated our pre-*Daubert* polygraph decisions as continuing to carry precedential force. *See Ruhe*, 191 F.3d at 388 (holding that "as a simple panel, *we are bound* by prior precedent" to adhere to the per se ban (emphasis added)); *Sanchez*, 118 F.3d at 197 (holding that the traditional rule that polygraph evidence is never admissible to impeach the credibility of a witness "*is binding* upon us in this case" (emphasis added)). In so doing, we effectively reaffirmed our per se ban on polygraph evidence. *Cf. United States v. Scheffer*, 523 U.S. 303, 311 (1998) (citing our *Sanchez* decision for the proposition that this circuit "has recently reaffirmed its *per se* ban" on polygraph evidence).

In sum, while we might otherwise be inclined to hold that *Daubert* requires a more nuanced evaluation of polygraph evidence than that dictated by the per se rule on which the district court relied, and that the change in law effected by *Daubert* leaves a mere panel free to acknowledge this requirement, our post-*Daubert* precedents foreclose our abandonment today of this Circuit's per se rule. Accordingly, we conclude that only the en banc Court has the authority to consider whether, "[a]fter *Daubert*, a per se rule is not viable." *Posado*, 57 F.3d at 433. We affirm the district court's exclusion — pursuant to our per se rule, and with no *Daubert* inquiry into the reliability of the proffered expert testimony — of the results of Prince-Oyibo's polygraph test.

B.

Prince-Oyibo next maintains that his religious persecution was an important part of his defense, in that it tended to explain why he would not question the large sum of money that he had to pay to obtain his visa. As a result, he argues, exclusion of this evidence violated his constitutional right to present a defense. The Government responds that the district court was within its discretion in excluding the evidence of persecution, since the defendant's fear of persecution was irrelevant to whether Prince-Oyibo intended to use an altered visa to enter the United States.

As the Government correctly notes, a defendant's right to present a defense is not absolute: criminal defendants do not have a right to present evidence that the district court, in its discretion, deems irrelevant or immaterial. *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered [Sixth Amendment] right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (applying same rule in Due Process context).

The only issue that the jury considered was whether Prince-Oyibo *actually* knew his visa to be "counterfeit, altered, falsely made or otherwise unlawfully obtained." While testimony on persecution may have been relevant to counter the Government's proffered "willful blindness" instruction (and, in fact, so the defense argued), this point

of potential relevance was mooted by the court's refusal of that instruction. *See supra* note 1. Similarly, such testimony might have been relevant in support of a duress defense; however, Prince-Oyibo did not present such a defense. The only issue before the jury was whether the defendant actually knew of his visa's illegality. Since evidence of Prince-Oyibo's religious persecution does not tend to prove his claim that he did not have actual knowledge that his visa was false, the district court was within its discretion in excluding the evidence of persecution as irrelevant.

## IV.

For the foregoing reasons, the conviction of Marvel Johnson Prince-Oyibo is affirmed.

*AFFIRMED*

HAMILTON, Senior Circuit Judge, dissenting:

This circuit has never addressed the question of whether our *per se* rule banning the admission of polygraph evidence to bolster or undermine the credibility of a witness is consistent with the principles concerning the admission of scientific or technical evidence enunciated in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). That question, which is finally squarely before the court, must be answered in the negative. For this reason, the district court should have given Prince-Oyibo the opportunity to demonstrate that his proffered polygraph evidence was admissible under *Daubert*. Because, on the record before the court, the exclusion of Prince-Oyibo's proffered polygraph evidence was not harmless error, I am constrained to conclude that Prince-Oyibo's 18 U.S.C. § 1546(a) conviction should be vacated and the case should be remanded to the district court with instructions to conduct a proper *Daubert* inquiry. If, on remand, the district court concludes that Prince-Oyibo's proffered polygraph evidence is inadmissible, the district court would be free to reinstate the conviction.

## I

The first seminal case addressing the admissibility of polygraph evidence was *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). In

*Frye*, the trial court refused to admit the results of a systolic blood pressure test (a crude precursor to the polygraph test), which the defendant sought to introduce in his murder trial. *Id.* at 1014. The issue before the *Frye* court was whether the results of the systolic blood pressure test should have been admitted into evidence. *Id.* The *Frye* court used a "general acceptance" standard in order to determine the admissibility of scientific or technical evidence in the context of the science of polygraphy. *Id.* at 1014. The general acceptance standard required the proponent of the evidence to show that the science was generally accepted in the relevant scientific community from which it emerged. *Id.* According to the *Frye* Court,

> [j]ust when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Id.* Because the systolic blood pressure test had "not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made," evidence of its results was ruled inadmissible. *Id.*

   *Frye* became the seminal polygraph case and, consequently, over the next five decades, virtually every state and federal court prohibited the admission of polygraph evidence. *See generally* James R. McCall, *Misconceptions and Reevaluation-Polygraph Admissibility After Rock and Daubert*, 1996 U. Ill. L. Rev. 363, 366-70 (analyzing *Frye* and its progeny). In this circuit, post-*Frye* and pre-*Daubert*, we concluded in numerous cases that the admission of polygraph evidence to bolster or undermine the credibility of a witness was *per se* inadmissible. *See, e.g.*, *United States v. Chambers*, 985 F.2d 1263, 1270-71 (4th Cir. 1993); *United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1134 (4th Cir. 1991); *see also United States v. Porter*, 821 F.2d 968, 974 (4th Cir. 1987) (holding that evidence "of a plea agree-

ment containing a provision that the government's witness has agreed to take a polygraph test to verify trial testimony constitutes impermissible bolstering of the witness's credibility"); *United States v. Tedder*, 801 F.2d 1437, 1444 (4th Cir. 1986) (holding that "evidence that the accused or a witness has taken a polygraph test is inadmissible"); *United States v. Morrow*, 731 F.2d 233, 238 (4th Cir. 1984) (holding that stipulated admission of polygraph test results was, "at most, harmless error"); *but see United States v. Webster*, 639 F.2d 174, 186 (4th Cir. 1981) (holding that district court has broad discretion to admit polygraph evidence).[1]

---

[1]As noted by the majority, *ante* at 5 n.2, our *per se* rule only applies to the admission of polygraph evidence offered to bolster or undermine the credibility of a witness. *Cf. A & S Council Oil Co.*, 947 F.2d at 1133 (holding that, where the government offered expert testimony on the credibility of a key government witness and the district court refused to permit cross-examination of the expert concerning the results of a polygraph test taken by the witness, the polygraph test results should have been admitted as an attack on the expert's opinion, although not as a direct attack on the credibility of the witness). Aside from *A & S Council Oil Co.*, this court, other courts, and the government have expressed approval of the use of polygraph tests in other situations. *See, e.g.*, *United States v. Music,* 2002 WL 31387536, at *1-3 (4th Cir. 2002) (unpublished) (upholding imposition of condition of supervised release requiring defendant convicted of possessing child pornography to participate in mental health program that could include polygraph testing); *United States v. Queen*, 2001 WL 882955, at *1 (4th Cir. 2001) (unpublished) (holding that the government's reliance, in failing to move for downward departure for substantial assistance, on the results of a polygraph examination, which indicated that defendant lied about distributing drugs while released on bond, did not amount to an unconstitutional motive, even though such results would have been inadmissible at trial and, thus, the district court did not err in refusing to compel the government to file a substantial assistance motion); *Bennett v. City of Grand Prairie, Texas*, 883 F.2d 400, 405-06 (5th Cir. 1989) (holding that magistrates may consider polygraph evidence when determining whether probable cause to issue an arrest warrant exists); *United States v. Lindell*, 881 F.2d 1313, 1326 (5th Cir. 1989) (holding that "[i]mpeachment evidence includes the results of a polygraph test" for purposes of the *Brady* rule). Not surprisingly, at oral argument, the government acknowledged that it frequently uses and heavily relies upon polygraph tests in a wide variety of situations, including when deciding on whether to make a substantial

In *Daubert*, the Supreme Court held that scientific expert testimony is admissible under Rule 702 of the Federal Rules of Evidence[2] if the expert's testimony is based on a reliable foundation and is relevant to the task at hand. *Daubert*, 509 U.S. at 597. *Daubert* expressly rejected the *Frye* "general acceptance" standard, holding that the *Frye* standard was superseded by the adoption of the Federal Rules of Evidence. *Daubert*, 509 U.S. at 589. In its stead, the Supreme Court outlined a flexible inquiry driven primarily by Federal Rules of Evidence 401, 402, 403, and 702. After discussing the thrust of the federal rules, as reflected in Rules 401 and 402, the Court noted that nothing in Rule 702, which governs the admissibility of expert testimony, makes general acceptance an absolute prerequisite to admissibility. *Daubert*, 509 U.S. at 588. What Rule 702 does require, the Court held, is that the district court make initial determinations that the proffered evidence possesses sufficient evidentiary reliability to be admissible as scientific, technical, or other specialized knowledge and that the proffered evidence is relevant in the sense that it will assist the trier of fact to understand the evidence or to determine a fact in issue. *Daubert*, 509 U.S. at 592-95. With regard to the reliability and relevance determinations, the Court emphasized a number of factors, including: (1) whether the theory can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether it has attracted wide-spread acceptance within the relevant scientific community. *Id.* at 592-94. The Court also emphasized that a district court evaluating the admission of expert testimony under Rule 702 should also consider other applicable rules of evidence, including Rule 403, which authorizes the exclusion of relevant evidence whose probative value

---

assistance motion on behalf of a criminal defendant to reduce his sentence; **nevertheless**, the government stressed the need for a *per se* rule banning the admission of polygraph evidence to bolster or undermine the credibility of a witness.

[2]Under Rule 702, a qualified expert witness may testify "in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

is substantially outweighed by its danger of unfair prejudice, confusion of the issues, or misleading the jury. *Daubert*, 509 U.S. at 595. The emphasis behind these suggested guidelines was that the district court had a "gatekeeping role" that was to ensure the reliability and relevancy of the information being offered. *Id.* at 597. This gatekeeping role was designed to give sufficient discretion to the district court in order to avoid problems for the trier of fact. *Id.*

Without question, our *per se* rule banning the admission of polygraph evidence to bolster or undermine the credibility of a witness is inconsistent with the flexible inquiry assigned to the district court by *Daubert*; indeed, the majority even impliedly recognizes this fact. *Ante* at 8 ("At the very least, by reserving the reliability assessment to the district courts, *Daubert* throws into doubt the viability of our per se rule that the results of an accused's or a witness's polygraph test are inadmissible to bolster or undermine credibility."). To be sure, *Daubert* and the Federal Rules of Evidence recognize the gatekeeper role of the district court, which is for the specific purpose of screening evidence under *Daubert* and the Federal Rules of Evidence. A *per se* rule of exclusion does not allow the district court to perform its proper function under *Daubert* and the Federal Rules of Evidence. Simply put, the proponent of polygraph evidence should be given the opportunity to demonstrate the relevance and the reliability of the evidence *before* a decision on admissibility is made.

Consistent with this analysis, numerous courts have recognized that a *per se* rule banning the admission of polygraph evidence is inconsistent with *Daubert*. *See, e.g.*, *United States v. Cordoba*, 104 F.3d 225, 228 (9th Cir. 1997) (holding that *Daubert* overruled its *per se* rule excluding all unstipulated polygraph evidence offered in civil and criminal trials); *United States v. Posado*, 57 F.3d 428, 434 (5th Cir. 1995) (holding that its *per se* rule against the admission of polygraph evidence in federal court not viable in light of *Daubert*); *see also United States v. Lea*, 249 F.3d 632, 638-41 (7th Cir. 2001) (noting that a district court's decision on the admissibility of polygraph results deserves considerable deference, and will be reversed only when the district court has abused its discretion); *United States v. Piccinonna*, 885 F.2d 1529, 1531-37 (11th Cir. 1989) (rejecting *per se* rule). The rationale behind these decisions is obvious and was best stated by the Fifth Circuit in *Posado*:

> [W]e do not now hold that polygraph examinations are sci-
> entifically valid or that they will always assist the trier of
> fact, in this or any other individual case. We merely remove
> the obstacle of the per se rule against admissibility, which
> was based on antiquated concepts about the technical ability
> of the polygraph and legal precepts that have been expressly
> overruled by the Supreme Court.

57 F.3d at 434.[3]

The majority in this case feels compelled to reject *Daubert*
because, in the majority's view, "our post-*Daubert* precedents fore-
close our abandonment . . . of this Circuit's per se rule." *Ante*
at 11. However, an examination of these precedents leads inexorably to the
conclusion that this court has not addressed, let alone answered, the
question of whether our *per se* rule banning the admission of poly-
graph evidence to bolster or undermine the credibility of a witness is
consistent with the principles concerning the admission of scientific
or technical evidence set forth in *Daubert*.

In *United States v. Toth*, 1996 WL 426865 (4th Cir. 1996), one of
Toth's codefendants entered into a plea agreement, which was condi-
tioned on the codefendant's successful completion of a polygraph
examination. *Id.* at *4. At Toth's trial, the codefendant testified for
the government, but the government had earlier argued in its opening
statement that some of the codefendant's testimony favorable to Toth
should not be believed. Toth sought to introduce evidence concerning
the codefendant's successful completion of the polygraph examina-
tion, but the district court excluded the evidence "under Fourth Circuit
precedent" and Rule 403. *Toth*, 1996 WL 426865, at *4.

On appeal, we noted that the "rule in this Circuit" is "that evidence
that an accused or a witness has taken a polygraph test is inadmissi-
ble." *Id.* We also recognized that our relevant circuit precedent was
decided before *Daubert* and that the *Posado* court observed that, due

---

[3]Of note, the *Posado* court also concluded that, because of the change
in the law affected by *Daubert*, *en banc* consideration was not necessary
to overturn that circuit's *per se* rule against admissibility of polygraph
evidence. *Posado*, 57 F.3d at 433.

to the change in the law effected by *Daubert*, *en banc* consideration was not necessary to overturn the Fifth Circuit's *per se* rule against admissibility of polygraph evidence. *Toth*, 1996 WL 426865, at \*4. We also suggested that "we might be inclined to agree with the Fifth Circuit in an appropriate case," but opined that it was "not necessary to reach that issue in Toth's case," because the district court acted within its discretion in excluding the proffered polygraph evidence under Rule 403. *Toth*, 1996 WL 426865, at \*4. Thus, the *Toth* case was not decided on the basis of the *per se* rule, but rather on the basis that, even if the *Daubert* standard applied, the district court did not abuse its discretion when it concluded that the proffered polygraph evidence was inadmissible under Rule 403. *Toth*, 1996 WL 426865, at \*5.

A year later, in *United States v. Sanchez*, 118 F.3d 192, 197 (4th Cir. 1997), the defendant argued that the district court erred when it refused to allow him to cross-examine a cooperating coconspirator about the polygraph examination she had failed and that he should have been allowed to mention the failed polygraph examination to the jury. *Id.* at 197. Again, we recognized the *per se* rule and found that the rule was "binding" on the court. *Id.* However, in a footnote, we expressly declined to reach the question of whether our *per se* rule banning the admission of polygraph evidence to bolster or undermine the credibility of a witness was consistent with *Daubert*. *Sanchez*, 118 F.3d at 197 n.3.

A little over two years later, in *United States v. Ruhe*, 191 F.3d 376 (4th Cir. 1999), the defendant argued that the district court erred when it refused to admit the defendant's polygraph evidence at trial. *Id.* at 387. In upholding the district court's decision on appeal, we rejected the defendant's argument on the basis that we were bound by our circuit's *per se* rule "absent contrary law from an *en banc* or Supreme Court decision." *Id.* at 388. In reaching this conclusion, we noted that we were declining to address the question of whether our *per se* rule banning the admission of polygraph evidence to bolster or undermine the credibility of a witness was consistent with *Daubert* because the defendant did not advance that argument. *Ruhe*, 191 F.3d at 388 n.9.

The above discussion makes it abundantly clear that this court has never addressed, let alone answered, the question of whether our *per*

*se* rule banning the admission of polygraph evidence to bolster or undermine the credibility of a witness is consistent with the principles set forth in *Daubert*. With the issue now squarely before the court, one must conclude, for the reasons set forth above, that our *per se* rule is not consistent with the principles concerning the admission of scientific or technical evidence outlined in *Daubert*. Moreover, *en banc* consideration is not necessary to reach this result because a panel of this court is not at liberty to ignore clear and unequivocal Supreme Court precedent. *Ruhe*, 191 F.3d at 388 ("[A]s a simple panel, we are bound by prior precedent from other panels in this circuit absent contrary law from an *en banc* or Supreme Court decision."); *Posado*, 57 F.3d at 433 ("Because no panel has squarely addressed the issue of polygraph admissibility since *Daubert*, en banc consideration is not required for this decision.").

The only remaining question concerns harmless error under Rule 52(a). A district court's evidentiary error is harmless if one can conclude, "'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). In this case, as the majority acknowledges, *ante* at 10, the categorical exclusion of the polygraph evidence indicating that Prince-Oyibo was telling the truth when he stated that he did not know his visa was fraudulent was relevant and material to whether Prince-Oyibo committed an 18 U.S.C. § 1546(a) violation. Under such circumstances, I am unable to conclude with fair assurance that the judgment in this case was not substantially swayed by the potentially erroneous exclusion of Prince-Oyibo's polygraph evidence. *Urbanik*, 801 F.2d at 698. Accordingly, the error in this case is not harmless.

## II

In summary, the district court should have given Prince-Oyibo the opportunity to demonstrate that his proffered polygraph evidence was admissible under *Daubert*. Because, on the record before the court, the exclusion of Prince-Oyibo's proffered polygraph evidence was not harmless error, Prince-Oyibo's 18 U.S.C. § 1546(a) conviction should be vacated and the case should be remanded to the district court with

instructions to conduct a proper *Daubert* inquiry. If, on remand, the district court concludes that Prince-Oyibo's proffered polygraph evidence is inadmissible under the principles enunciated in *Daubert*, the district court would be free to reinstate the conviction.