**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 14-4338
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JEAN PAUL ALVARADO,

Defendant - Appellant.

_____

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg.  Michael F. Urbanski, District Judge.  (5:12-cr-00030-MFU-1)

_____

Argued: October 29, 2015                    Decided:  March 7, 2016

_____

Before NIEMEYER and HARRIS, Circuit Judges, and DAVIS, Senior Circuit Judge.

_____

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Harris joined.  Senior Judge Davis wrote a separate opinion concurring in part and dissenting in part.

_____

**ARGUED:**  Andrea Lantz Harris, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlottesville, Virginia, for Appellant.  Elizabeth G. Wright, OFFICE OF THE UNITED STATES ATTORNEY, Harrisonburg, Virginia, for Appellee.  **ON BRIEF:** Larry W. Shelton, Federal Public Defender, Christine Madeleine Lee, Research and Writing Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Roanoke, Virginia, for Appellant.  Anthony P. Giorno, Acting United States Attorney, Roanoke, Virginia, Jean B. Hudson, Assistant United States Attorney, Franklin Sacha, Appellate Intern, OFFICE

OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.

NIEMEYER, Circuit Judge:

A jury convicted Jean Paul Alvarado of knowingly and intentionally distributing heroin to Eric Thomas on March 29, 2011, with Thomas' death resulting from the use of the heroin so distributed, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The district court sentenced Alvarado to the mandatory minimum sentence of 20 years' imprisonment.

On appeal, Alvarado contends that the district court erred (1) in failing to clarify for the jury that the results-in-death element meant that the jury could not convict him of the charged offense if heroin was only a contributing cause of death; (2) in failing to instruct the jury that Alvarado must have "reasonably foreseen" that death could result; and (3) in admitting hearsay testimony that Thomas said he purchased heroin from "Fat Boy," meaning Alvarado, in violation of the hearsay rule and the Sixth Amendment's Confrontation Clause.

We affirm. First, we conclude that, because there was no evidence in the record that Thomas could have died without the heroin, the jury's verdict was necessarily consistent with the Supreme Court's requirement of but-for causation. See Burrage v. United States, 134 S. Ct. 881, 887-88 (2014). As a result, the district court's decision not to elaborate on the meaning of the statutory results-in-death language did not amount to an abuse of discretion, let alone plain error, in light of the

3

court's legitimate concerns about confusing the jury. Second, we conclude that our decision in United States v. Patterson, 38 F.3d 139 (4th Cir. 1994), forecloses Alvarado's argument that the district court should have instructed the jury on the foreseeability of death. And finally, we conclude that the district court did not commit reversible error in admitting hearsay testimony that Thomas said he purchased heroin from "Fat Boy" because (1) even if the hearsay did not fall under a hearsay exception, its admission was harmless; and (2) the hearsay was not "testimonial" and therefore did not implicate Alvarado's Sixth Amendment right of confrontation.

I

In response to custodial police questioning on March 30, 2011, Alvarado admitted that, on the previous day, March 29, he had sold five bags of heroin to Thomas. Text messages between Alvarado and Thomas indicated that the sale occurred during the late morning hours in the bathroom of a grocery store in Harrisonburg, Virginia. Within hours of that transaction, when Thomas' fiancée, Monica Shaughnessy, returned to the apartment in which she and Thomas were living, she discovered Thomas slumped over in a chair. As she testified at trial, "As soon as I opened the door, I knew what was going on. . . . I knew he had overdosed on a mixture of Xanax and heroin. He had an

4

amazing amount of Xanax and I knew he was going to get heroin that day. His new thing was to mix them together and that will kill you and he knew this." When she touched Thomas, she found that "[h]e was freezing." She said she had "[n]ever felt a human cold like that."

When Shaughnessy was unable to revive Thomas with CPR, she called 911, a call that was received by the dispatcher at 3:13 p.m. Emergency responders could not resuscitate Thomas, and at 4:07 p.m., he was pronounced dead at a local hospital. When investigators arrived at Thomas' apartment within an hour of the emergency 911 call, they observed an array of drug paraphernalia around where Thomas had been sitting, including needles, needle caps, and drug packaging materials. They also discovered a cell phone, which led them to Alvarado, who was arrested the next day.

A grand jury indicted Alvarado for heroin distribution resulting in death, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

Prior to trial, Alvarado filed a motion in limine to exclude evidence of statements made by Thomas, including statements by which Thomas told friends that he chiefly bought heroin from a drug dealer named "Fat Boy," referring to Alvarado. The district court deferred resolution of the motion until trial and at that time admitted the statements.

5

At trial, a former DEA special agent, who had investigated Thomas' death, testified that Thomas' and Alvarado's cell phone records revealed that Thomas had made contact with Alvarado and a man named Luis Blass, another drug dealer, in the days and weeks before his death. The investigator testified that Thomas' last contact with Blass occurred on March 24, 2011 -- five days before Thomas' death. Thomas communicated with Alvarado, however, with text messages on March 26, 27, 28, and 29. In two text messages, one on March 27 and one on March 29 (at 10:40 a.m.), Thomas wrote that he wanted a "b" from Alvarado (referring to a "bundle" of heroin bags wrapped together). In further messages on March 29, Thomas and Alvarado arranged plans to meet in the bathroom of a grocery store, and, in the final text, Thomas confirmed to Alvarado that he had seen him and was walking into the bathroom.

Thomas' fiancée Shaughnessy testified that Thomas had begun using heroin in the summer of 2009 and that he had progressed to daily use by early 2010. She stated that Thomas used his entire daily purchase of heroin, usually a bundle of five bags and sometimes more, "[p]retty much within an hour span" of consummating the purchase. While Thomas would often share some heroin with Shaughnessy, he would consume the remainder almost immediately. She also testified that, on the day of his death, Thomas had driven her to work in the morning and had indicated

6

to her that he intended to buy heroin soon thereafter before going to play golf. "[H]e had to go get heroin because he wasn't going to be able to [play golf] without that." She stated that she knew that Thomas purchased heroin from a dealer named "Fat Boy," because he said so and because she often went with Thomas (about once a week) when he purchased heroin from "Fat Boy," referring to Alvarado. Shaughnessy also said that Alvarado sold Thomas heroin in white-colored bags.

Josh Melewski, one of Thomas' best friends, also testified that Thomas did not stockpile heroin, but would instead use it almost immediately after purchasing it. Recounting Thomas' suppliers over the years, Melewski said that Thomas first obtained heroin in 2009 from a man named Miguel Rodriguez. After Rodriguez, he purchased heroin from a man named Luis, who sold Thomas heroin in square-shaped, blue-colored bags that had a stamp on them. Melewski also testified that, beginning in 2010, Thomas started purchasing from a dealer that Thomas referred to as "Fat Boy." Melewski stated that "Fat Boy" sold heroin in "[p]lain bags with no stamp."

On the day after Thomas' death, Melewski met with Shaughnessy at a hotel, where Shaughnessy took Melewski into a bathroom and showed him bags of heroin she had purportedly taken from their apartment on the day of the overdose. Melewski said

that the bags that Shaughnessy produced "were the rectangle, clear, wax bags."

A forensic toxicologist with the Virginia Department of Forensic Science, Dr. David Burrows, testified that a drug screen of Thomas' blood and urine revealed the presence of a high concentration of morphine, which, he explained, was the metabolized form of heroin. The drug screen also revealed a "therapeutic level" of Xanax -- i.e., an amount that a physician would recommend to treat a specific condition -- and an amount of Benadryl that was "below the associated toxic level." Dr. Burrows acknowledged that Benadryl could "aggravate" the effects of heroin and that the combination of heroin, Benadryl, and Xanax could have "synergistic effects." He did not, however, give an opinion on the role that each of the drugs played in Thomas' death.

Virginia's Assistant Chief Medical Examiner, Dr. Gayle Suzuki, performed the autopsy on Thomas, and, at trial, she gave her opinion as to the cause of death. She concluded that Thomas died of "heroin intoxication." While Dr. Suzuki acknowledged that Thomas also had Xanax and Benadryl in his system at the time of his death, as found by Dr. Burrows, she testified that neither "contributed to" Thomas' death. She explained that, "without the heroin, [Thomas] doesn't die."

8

After closing arguments, the district court instructed the jury:

> If you find the government has proved beyond a reasonable doubt that the defendant knowingly or intentionally distributed a mixture or substance containing a detectable amount of heroin on or about March 29, 2011, you must then determine whether the government has proved beyond a reasonable doubt that <u>death resulted from the use of such substance</u>.

(Emphasis added). After retiring to deliberate, the jury sent a question to the district judge asking whether the phrase "death resulted from the use of the heroin" meant "solely from the use of the heroin or that the heroin contributed to [Thomas'] death." After the district court asked for advice from counsel about how to respond, counsel for both parties agreed not to provide any clarifying instruction:

> [Assistant U.S. Attorney]: Your Honor, we're of the opinion, and I believe I've actually discussed it with defense counsel and for once in the last three days, we're of the same opinion, that it is a bad idea to provide any additional information.
>
> *      *      *
>
> Our suggestion is we just say, I'm sorry, you've got to read the letter of the instructions and interpret it the way that you can, as best as you can.
>
> *      *      *
>
> [Counsel for Alvarado]: I don't think you can instruct them further on that. I'm not quite sure what you would instruct them anyway.

The court agreed, noting that "elaborating on a term often makes it less, rather than more, clear. . . . It is on this ground

9

that some courts, including our own, tell district judges not to try to explain to a jury the meaning of beyond a reasonable doubt. Probably the same is true of results from."

After the district court discharged a juror for an unrelated reason and empaneled an alternate, the reconstituted jury submitted essentially the same question:

> The jury would like clarification on . . . the section that says "death resulted from the use of the heroin." Should that be interpreted as meaning death resulted "exclusively" from the heroin or the heroin contributed to the death?

With the agreement of counsel, the court responded:

> Ladies and gentlemen, the Court has received two written questions from you . . . at 11:25 this morning. The first question seeks clarification of the, quote, death resulted from the use of the heroin, unquote, language.

> My instruction on the law on this issue is set forth on page 25 of the jury instructions and states as follows: [Court reads the original instruction given to the jury].

> You are to consider this instruction, along with all of the other instructions in this case, in reaching your verdict.

The reconstituted jury retired to deliberate and, within 30 minutes, returned a guilty verdict, making two findings: (1) that Alvarado knowingly and intentionally distributed heroin to Thomas on March 29, 2011, and (2) that death resulted from the use of the heroin so distributed.

The district court sentenced Alvarado to 20 years' imprisonment and a 3-year term of supervised release.

10

On appeal, Alvarado requests a new trial, arguing that (1) the district court should have clarified the "death resulted from" phrase in its jury instructions; (2) the district court should have instructed the jury on the foreseeability of death resulting from Alvarado's distribution of heroin; and (3) the testimony that Thomas said he purchased heroin from "Fat Boy" constituted inadmissible hearsay and violated Alvarado's right to confrontation under the Sixth Amendment.

II

Alvarado contends first that, in light of the Supreme Court's decision in Burrage, the district court erred in failing to clarify for the jury the meaning of the "death results from" statutory enhancement element of the offense. See 21 U.S.C. § 841(b)(1)(C) (enhancing the sentence for drug distribution "if death . . . results from the use of such substance"); Burrage, 134 S. Ct. at 887 ("Because the 'death results' enhancement increase[s] the minimum and maximum sentences to which [the defendant is] exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt"). He argues that "the jury clearly thought the court's instruction might permit it to convict if it found that heroin was a mere contributing cause, because it asked about it, twice, receiving no answer either time," and he notes that "Burrage states that

11

convicting on the contributing cause theory is reversible error."

The government contends that the district court did not commit any error when responding to the jury because the court accurately stated the controlling law by reciting the specific language of § 841(b)(1)(C). It maintains that, because the Burrage Court concluded that the phrase "death results from" carries its ordinary, commonly understood meaning of but-for causation, the district court appropriately decided not to further explain the phrase. In addition, the government contends that Alvarado waived this argument by not only failing to object to the court's response to the jury's question, but indeed by agreeing that the court should not attempt to clarify the phrase "death results from" with anything other than the straightforward statutory language because of the potential confusion in attempting to define the phrase.

We begin by noting, as clarified at oral argument, that Alvarado does not contend that the instruction that the district court gave was erroneous. Rather, the question presented is whether the court needed to explain further the statutory phrase "results from." Ordinarily, we review the district court's decision not to give a further clarifying instruction for abuse of discretion. See United States v. Foster, 507 F.3d 233, 244 (4th Cir. 2007). And when, as in this case, a party fails to

12

object to an instruction or the failure to give an instruction, we review for "plain error." See Fed. R. Crim. P. 30(d); id. 52(b).

As a general matter, a district court has an obligation to give instructions to the jury that "fairly state[] the controlling law." United States v. Cobb, 905 F.2d 784, 789 (4th Cir. 1990). Similarly, when the jury asks a clarifying question, the "court's duty is simply to respond to the jury's apparent source of confusion fairly and accurately without creating prejudice." Foster, 507 F.3d at 244 (internal quotation marks and citation omitted).

It is significant that, after the court received the jury's inquiry to clarify "results from" and told the jury to rely on the instructions as given, leaving it to apply the ordinary meaning of "results from," Alvarado's counsel did not complain that the court's response was unfair or inaccurate. To the contrary, she explicitly shared the view that any further "clarification" might lead to confusion. Nonetheless, Alvarado now argues, relying on Burrage, that the district court's failure to clarify "results from" allowed the jury to convict him even if heroin was only a contributing cause of Thomas' death, a more lenient standard than but-for causation. But, in the context of the record in this case, Burrage does not help Alvarado.

13

The _Burrage_ Court held that "results from" in § 841(b)(1)(C) invokes the "ordinary, accepted meaning" of the phrase. 134 S. Ct. at 891. And the ordinary meaning of "results from" is but-for causation -- _i.e._, that death would not have occurred in the absence of heroin. _Id._ at 888. Or, as the Court explained, a drug qualifies as a but-for cause of death "if, so to speak, it was the straw that broke the camel's back." _Id._ Thus, a drug that plays a "nonessential contributing role" does not suffice to apply the § 841(b)(1)(C) penalty enhancement. _See_ _id._ The Court further noted that "results from" was employed in § 841(b)(1)(C) in a way similar to other phrases of but-for causation, such as "because of," "based on," and "by reason of." _Id._ at 888-89.

In light of _Burrage_ and in the context of this case, we do not find that the district court abused its discretion, let alone committed plain error, in refusing to attempt a clarification of "results from." There was no evidence in this case that would allow a jury to find that heroin was only a nonessential contributing cause of Thomas' death. _Cf._ _Burrage_, 134 S. Ct. at 890 ("We need not accept or reject the special rule developed for [cases where multiple sufficient causes independently, but concurrently, produce a result], since there was no evidence here that [the victim's] heroin use was an independently sufficient cause of his death"). As Dr. Suzuki,

14

the only person who testified on causation, stated, "it's the heroin in [Thomas'] blood . . . that caused his death," and "without the heroin, [Thomas] doesn't die." Indeed, she explained further that neither the Xanax nor the Benadryl "contributed to" Thomas' death. Moreover, no party suggested that, even without the heroin, Thomas would have died. The only evidence presented was that, but for the heroin, death would not have resulted. As such, any hypothesis that the jury was allowed to convict Alvarado because the heroin played merely a nonessential contributing role in Thomas' death has no support in the record. In this context, the district court's decision not to further define "death results from" cannot be found to be an abuse of discretion, let alone plain error. Cf. United States v. Walton, 207 F.3d 694, 698 (4th Cir. 2000) (en banc) ("[W]e remain convinced that attempting to explain the words 'beyond a reasonable doubt' is more dangerous than leaving a jury to wrestle with only the words themselves").

We recognize that, in different circumstances where the record might suggest that the decedent ingested heroin but might have died nonetheless from the effects of other substances, a court's refusal to clarify the phrase "results from" might become a problem. In such an ambiguous scenario, a jury, without a clarifying instruction, might be allowed to apply the penalty enhancement under § 841(b)(1)(C) even if heroin was not

15

a but-for cause of death.  To foreclose such an erroneous finding, the court would likely have an obligation to explain that a drug that plays a nonessential contributing role does not satisfy the results-from causation necessary to apply the enhancement.  But, based on the record in this case, we cannot conclude that the district court abused its discretion or committed plain error.

III

Alvarado also contends that the district court erred in failing to instruct the jury that "defendants should only be held liable [under § 841(b)(1)(C)] for the foreseeable results of their actions."  While he acknowledges that our decision in United States v. Patterson, 38 F.3d 139 (4th Cir. 1994), directly contradicts his position, he argues that Patterson no longer controls in light of Burrage, where the Supreme Court held that § 841(b)(1)(C) was an element of the offense, see Burrage, 134 S. Ct. at 887.  When analyzed as an element, according to Alvarado, § 841(b)(1)(C) becomes subject to the same protections as other elements of an offense.  He notes, for instance, that the Supreme Court has held that, absent clear congressional intent to the contrary, common law "requires the government to prove that the defendant's actions were not only a cause of the result, but also that the result was a foreseeable

16

one." (Emphasis added). Citing <u>Staples v. United States</u>, 511 U.S. 600, 606 (1994), he also points out that "offenses that require no <u>mens</u> <u>rea</u> generally are disfavored."

The government contends that <u>Patterson</u> remains good law, noting that we continue to rely on it in unpublished opinions, and that other courts of appeals have similarly interpreted § 841(b)(1)(C) as containing no foreseeability requirement.

We agree with the government that <u>Patterson</u> remains good law on this issue. The analysis in <u>Patterson</u> did not depend on whether or not § 841(b)(1)(C) served as an element of the offense. Rather, we focused on the meaning of the statutory language, regardless of its role, to conclude that "§ 841(b)(1)(C) imposes no reasonable foreseeability requirement." <u>Patterson</u>, 38 F.3d at 145. We explained that "the plain language of § 841(b)(1)(C) does not require, nor does it indicate, that prior to applying the enhanced sentence, the district court must find that death resulting from the use of a drug distributed by a defendant was a reasonably foreseeable event." <u>Id.</u> Indeed, we concluded that the "plain language reveals Congress' intent" to "put[] drug dealers . . . on clear notice that their sentences will be enhanced if people die from using the drugs they distribute." <u>Id.</u>

And the Supreme Court's decision in <u>Staples</u> does not suggest that § 841(b)(1)(C) should be construed otherwise. The

17

*Staples* Court did observe, as Alvarado notes, that "offenses that require no *mens rea* generally are disfavored" and that "some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime." 511 U.S. at 606. But the crime for which Alvarado was convicted does in fact contain a *mens rea* requirement. As the Supreme Court noted in *Burrage*, "the crime charged . . . has two principal elements: (i) knowing or intentional distribution of heroin, § 841(a)(1), and (ii) death caused by ('resulting from') the use of that drug, § 841(b)(1)(C)." 134 S. Ct. at 887 (footnote omitted). The first element -- knowing or intentional distribution of heroin -- explicitly includes a *mens rea*. *Staples* does not suggest that *every element* of an offense must contain a *mens rea*, directing only that we should think twice before concluding that an *offense*, viewed as a whole, contains no *mens rea* requirement. See 511 U.S. at 606.

As we pointed out in *Patterson*, § 841(b)(1)(C) does not contain a separate *mens rea*. 38 F.3d at 145. Rather, it serves to elevate the crime of knowingly or intentionally distributing heroin to a more serious level.

Thus, we conclude that the district court fairly stated the controlling law in refusing to instruct the jury that § 841(b)(1)(C) contains a foreseeability requirement. See *Cobb*, 905 F.2d at 789.

18

Finally, Alvarado contends that the district court erred in admitting hearsay that Thomas, the deceased declarant, had said that he purchased heroin from "Fat Boy," a name referring to Alvarado. Alvarado argues that the hearsay did not fall within any exception to Rule of Evidence 802 (the hearsay rule) and, moreover, that its admission violated the Confrontation Clause, which protects his right to cross-examine declarants making "testimonial" statements.

The government contends that the district court properly admitted the testimony about Thomas' statements under the statement-against-interest exception to the hearsay rule contained in Rule of Evidence 804(b)(3). It also maintains that admitting Thomas' statements did not violate Alvarado's rights under the Confrontation Clause because Thomas made the statements to friends in an informal context and therefore the statements were not "testimonial."

Rule 804(b)(3) provides, in relevant part, that a hearsay statement made by a declarant who is unavailable as a witness may nevertheless be admitted as evidence if the statement was one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to civil or criminal liability" and if the statement

is "supported by corroborating circumstances that clearly indicate its trustworthiness." Stated otherwise, "hearsay may be admitted under this exception if (1) the declarant is unavailable, (2) the statement is genuinely adverse to the declarant's penal interest, and (3) 'corroborating circumstances clearly indicate the trustworthiness of the statement.'" United States v. Bumpass, 60 F.3d 1099, 1102 (4th Cir. 1995).

Alvarado does not, in making his argument, appear to rely on the first prong, requiring that the declarant be unavailable, or the third prong, requiring corroborating circumstances that indicate the trustworthiness of the statements. Rather, he argues that the second prong, which requires that the statements be adverse to the declarant's penal interest, was not satisfied. With respect to that prong, he concedes that the portion of Thomas' statements in which he admitted to purchasing heroin was "nominally against [his] penal interest" -- although "barely so" because Thomas was speaking "only to other drug users and friends." Rather, he argues that the "identification of 'Fat Boy' as Thomas' drug source was never against Thomas' penal interest, and should have been appropriately redacted or excluded in its entirety." (Emphasis added). We need not, however, resolve whether the identification of "Fat Boy" was sufficiently adverse to Thomas' interest to fit the Rule 804(b)(3) exception because we conclude that, even if there was

20

error, it was harmless in light of the strength of the other evidence against Alvarado.  See United States v. Banks, 482 F.3d 733, 741 (4th Cir. 2007).

That evidence all but conclusively confirms that only Alvarado sold heroin to Thomas on the day of his death and that Thomas injected that heroin soon thereafter, resulting in his death.  For example, in addition to Thomas' text-message exchanges with Alvarado, in which Thomas indicates his intent to buy a bundle of heroin from Alvarado, Alvarado himself admitted, during his custodial interrogation, that he sold heroin to Thomas on the day of the fatal overdose.  And the heroin packaging materials found near Thomas' body were of the type and color used by Alvarado and not other suppliers from whom Thomas had previously purchased heroin.  Also, multiple witnesses confirmed that Thomas used heroin almost immediately after purchasing it.  The evidence here indicates as much, as an array of drug paraphernalia was discovered around Thomas mere hours after he purchased heroin from Alvarado.  No evidence even suggests that Thomas obtained the heroin from anyone other than Alvarado on the day of his death.  On this record, we can conclude "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," if indeed

21

there was error.  United States v. Heater, 63 F.3d 311, 325 (4th Cir. 1995) (internal quotation marks and citation omitted).

Alvarado's Confrontation Clause argument is also unpersuasive.  That Clause provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Supreme Court has interpreted the Clause as prohibiting the admission of "testimonial" statements from an unavailable declarant, unless the defendant had a prior opportunity to cross-examine that declarant.  Crawford v. Washington, 541 U.S. 36, 68 (2004) ("Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination").  While the Court has not provided an exhaustive list of what constitutes "testimonial evidence," the term encompasses such things as "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations."  Id.; see also Davis v. Washington, 547 U.S. 813, 822 (2006) (explaining that statements in an interrogation qualify as "testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution").  But it is undisputed that testimonial evidence does not include

22

statements made to friends in an informal setting. See United States v. Jordan, 509 F.3d 191, 201 (4th Cir. 2007) ("To our knowledge, no court has extended Crawford to statements made by a declarant to friends or associates") (citing cases from the Second, Sixth, and Eighth Circuits); see also United States v. Dargan, 738 F.3d 643, 650 (4th Cir. 2013) ("Harvey made the challenged statements to a cellmate in an informal setting -- a scenario far afield from the type of declarations that represented the focus of Crawford's concern"); United States v. Udeozor, 515 F.3d 260, 270 (4th Cir. 2008) ("Because [the defendant] plainly did not think he was giving any sort of testimony when making his statements to the victim during the recorded telephone calls, the admission of these two taped conversations into evidence did not violate [the defendant's] rights under the Confrontation Clause").

In this case, the challenged testimony included statements that Thomas made to his fiancée and to one of his best friends -- in an informal setting -- that he purchased his heroin from "Fat Boy." Because such statements were not testimonial, their admission did not implicate the Confrontation Clause.

* * *

23

For the reasons given, we affirm the judgment of the district court.

AFFIRMED

DAVIS, Senior Circuit Judge, concurring in part and dissenting in part:

My friends in the majority affirm the district court's judgment against Jean Paul Alvarado, who was convicted of violating 21 U.S.C. § 841(a)(1) and sentenced to a mandatory minimum of twenty years' imprisonment pursuant to 21 U.S.C. § 841(b)(1)(C) for distributing heroin to Eric Thomas that resulted in Thomas's death. The majority holds that the district court's jury instructions as to the meaning of § 841(b)(1)(C)'s requirement that "death . . . results from" the use of the distributed substance were adequate and that the district court neither abused its discretion nor committed plain error in its instructions. Although the question presented is close, I am persuaded that Alvarado did not receive the minimally fair trial the Constitution guarantees him, one in which a properly instructed jury holds the government to its obligation to prove the elements of the charged offense beyond a reasonable doubt. Accordingly, I respectfully dissent.

For the reasons that follow, I would vacate the judgment of conviction under § 841(b)(1)(C) and remand with instructions that Alvarado either (1) be accorded a new trial or (2) be resentenced without a new trial on the lesser included § 841(a)(1) distribution offense. In all other respects, I join the majority in affirming the judgment of the district court.

25

Alvarado challenges, among other things, the adequacy of the district court's jury instructions as to the meaning of the statutory phrase "results from." At trial, the district court instructed the jury that it must "determine whether the government has proved beyond a reasonable doubt that death resulted from the use of [a substance that Alvarado distributed]." J.A. 947. This language tracked § 841(b)(1)(C)'s requirement that a sentencing enhancement applies when "death . . . results from the use of" the distributed substance. Alvarado contends that these jury instructions were inadequate and therefore erroneous and prejudicial.

## A.

"Whether jury instructions were properly given is a question of law." United States v. Herder, 594 F.3d 352, 359 (4th Cir. 2010) (quoting United States v. Morrison, 991 F.2d 112, 116 (4th Cir. 1993)). We ordinarily review a court's decision to give particular instructions and the content of those instructions for abuse of discretion. United States v. Kivanc, 714 F.3d 782, 794 (4th Cir. 2013); United States v. Russell, 971 F.2d 1098, 1107 (4th Cir. 1992). The majority suggests, however, that because Alvarado failed to object to the district court's decision not to clarify or supplement its

26

instructions in response to the jury's questions during deliberations, our review should be limited to that of plain error. I disagree and believe that review for abuse of discretion is warranted.

Prior to trial, Alvarado proposed alternative jury instructions regarding § 841(b)(1)(C)'s causation element. The district court denied Alvarado's proposed instructions and instead decided that it would "instruct the jury only on what the statutory language is"—that is, it would instruct the jury only that § 841(b)(1)(C) requires "that death resulted from the use of [the] heroin." J.A. 481, 486–87. Alvarado expressly objected both to the court's denial of his proposed instructions and to the court's decision to "use[] the statutory language only" in instructing the jury on this matter. J.A. 487. Whether or not the former objection was sufficient to preserve the issue, see Jones v. United States, 527 U.S. 373, 387 (1999), in my view, the latter objection, which Alvarado raised before the jury retired, effectively preserved for appeal the issue of whether the "results from" instruction was adequate, notwithstanding Alvarado's failure to object when the court later declined to elaborate on the meaning of the statutory language. See id. (recognizing that a party that objects to a jury instruction before the jury retires may challenge the instruction on appeal); Fed. R. Crim. P. 30(d), 51(b).

27

In analogous situations, this Court has "held that when a party moves in limine to exclude evidence, the party need not renew its objection when evidence within the scope of the motion is introduced at trial." United States v. Cone, 714 F.3d 197, 225 (4th Cir. 2013) (Wynn, J., concurring in part and dissenting in part) (citing United States v. Ruhe, 191 F.3d 376, 383 n.4 (4th Cir. 1999)); see also United States v. Williams, 81 F.3d 1321, 1325 (4th Cir. 1996) ("[M]otions in limine may serve to preserve issues that they raise without any need for renewed objections at trial."); Fed. R. Evid. 103(b). Similarly, Alvarado's objection to the adequacy of the "results from" instruction prior to deliberations most assuredly preserved the issue for appeal, and Alvarado did not need to renew this objection when the district court provided its instructions and later declined to expand on them. Accordingly, I would review for abuse of discretion.[1]

---

[1] Further, by failing to argue in its appellate brief for application of plain error review and instead recognizing the propriety of review for abuse of discretion, the government has "waived the waiver argument" regarding Alvarado's purported failure to object to the jury instructions. See United States v. Carthorne, 726 F.3d 503, 509 n.5 (4th Cir. 2013) (citation omitted) (collecting cases), called into question in part on other grounds by Johnson v. United States, 135 S. Ct. 2551, 2560 (2015). Although the government ultimately sought plain error review at oral argument, this belated effort was insufficient to preserve the government's contention that Alvarado waived his jury instruction challenge at trial. See United States v. Powell, 666 F.3d 180, 185 n.4 (4th Cir. 2011) ("By not (Continued)

B.

In assessing whether the district court abused its discretion, this Court must "review the entire jury charge to determine whether the jury was properly instructed on the elements of the offenses and the accused's defenses." Herder, 594 F.3d at 359. "By definition, a court 'abuses its discretion when it makes an error of law.'" United States v. Moye, 454 F.3d 390, 398 (4th Cir. 2006) (en banc) (quoting United States v. Prince-Oyibo, 320 F.3d 494, 497 (4th Cir. 2003)). The key inquiry is "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." Kivanc, 714 F.3d at 794 (quoting Noel v. Artson, 641 F.3d 580, 586 (4th Cir. 2011)).

Alvarado contends that the jury instructions did not adequately convey that § 841(b)(1)(C) requires a showing that Thomas's use of the heroin that Alvarado distributed was either independently sufficient to cause Thomas's death or a but-for cause of Thomas's death. Alvarado bases this argument on the

presenting any of these arguments in its appellate brief, the Government has abandoned them." (citing Snyder v. Phelps, 580 F.3d 206, 216 (4th Cir. 2009), aff'd, 562 U.S. 443 (2011))). Thus, review for abuse of discretion is appropriate for this reason as well.

29

Supreme Court's decision in United States v. Burrage, 134 S. Ct. 881 (2014), which the Court decided after the jury's verdict but before sentencing. In Burrage, the Court considered, among other things, whether a defendant "may be convicted under [§ 841(b)(1)(C)'s] 'death results' provision . . . when the use of the controlled substance was a 'contributing cause' of the death." Id. at 886. Acknowledging that the Controlled Substances Act does not expressly define the phrase "results from," the Court determined that the phrase's "ordinary meaning" requires actual, or but-for, causation. Id. at 887–88. The Court held that, "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death . . . a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death." Id. at 892. Thus, the Court in Burrage recognized that a court may not impose § 841(b)(1)(C)'s mandatory minimum sentence based on a jury finding that use of the drug distributed by the defendant merely contributed to someone's death; rather, use of the drug must have been an independently sufficient cause or a but-for cause of the death for the penalty enhancement to apply. See id. Accordingly, Alvarado argues that the jury instructions provided at his trial, which merely directed the jury to determine

30

whether "death resulted from" Thomas's use of heroin, were erroneous, i.e., prejudicially incomplete.

The government maintains that the jury instructions could not have been erroneous because they precisely stated the controlling law—that is, the district court merely tracked the language of the Controlled Substances Act in instructing the jury to determine whether death resulted from the use of a controlled substance. Further, the government argues that the meaning of the language "results from" is clear and unambiguous in light of the Supreme Court's recognition in Burrage that but-for causation is the "ordinary meaning" of the phrase. See id. at 887–88. In other words, the government contends that the statutory language is plain on its face and therefore did not require further explanation. I disagree.

Significantly, the relevant inquiry is whether the jury instructions "adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." Kivanc, 714 F.3d at 794 (emphasis added) (quoting Noel, 641 F.3d at 586). It is therefore not enough for jury instructions merely to parrot the controlling law where the statutory text itself may mislead or confuse the jury. My friends in the majority and I are in agreement on this matter, as they expressly recognize that, in circumstances "where the record might suggest that the decedent

31

ingested heroin but might have died nonetheless from the effects of other substances, a court's refusal to clarify the phrase 'results from' might become a problem." Ante at 14. The majority explains that, "[i]n such an ambiguous scenario, a jury, without a clarifying instruction, might be allowed to apply the penalty enhancement under § 841(b)(1)(C) even if heroin was not a but-for cause of death." Id. at 14-15. The majority and I differ, however, in our analyses of whether this case presents such an "ambiguous scenario," as I conclude (based on my study of the entire record) that it does, while the majority determines that it does not.

By failing to clarify the causation requirement in its jury instructions, the district court (acting without the forthcoming guidance from the Supreme Court) certainly confused or misled the jury, and it left open the possibility that the jury could convict Alvarado upon determining that Thomas's use of heroin was merely a contributing factor in Thomas's death. A guilty verdict on this basis would plainly have prejudiced Alvarado; indeed, the Supreme Court reversed a conviction in Burrage where the jury had relied on this "markedly different understanding of the statute." See 134 S. Ct. at 892.

## C.

Although the Supreme Court indicated that the phrase "results from" imports an actual causation requirement based on

32

its "ordinary meaning," this meaning was far from clear to the jury in Alvarado's case. In fact, the jury unmistakably expressed its confusion as to the applicable causation requirement, even though the district court had tracked the language of the Controlled Substances Act in its instructions.

During deliberations, the jury produced a note stating, "We have a question regarding whether 'death resulted from the use of the heroin' means <u>solely</u> from the use of heroin, or that heroin '<u>contributed to [Thomas's] death</u>.'" J.A. 747. Once the reconstituted jury began its deliberations anew the following day, the jury repeated its question: "The jury would like clarification on . . . [t]he section that says 'death resulted from the use of the heroin.' Should this be interpreted as meaning death resulted 'exclusively' from the heroin, or that the heroin contributed to the death?" J.A. 922. In response, the district court merely pointed the jury to the original instruction containing the "results from" language, providing no further guidance to alleviate the ambiguity that the jury had highlighted.[2]

---

[2] Even though Alvarado did not object to the district court's response to these inquiries, I nonetheless consider the jury's questions and the district court's response in assessing the adequacy of the instructions, as our precedent requires us to consider the instructions in light of the entire jury charge and the whole record. See Kivanc, 714 F.3d at 794; Herder, 594 F.3d at 359.

33

The jury in this case was not alone in recognizing that the phrase "results from" is susceptible to multiple meanings. In *Burrage*, the Solicitor General argued before the Supreme Court that "results from" did not require but-for causation. See 134 S. Ct. at 890 (noting that the government had "urge[d] an interpretation of 'results from' under which use of a drug distributed by the defendant need not be a but-for cause of death, nor even independently sufficient to cause death"). The Supreme Court, however, "decline[d] to adopt the Government's permissive interpretation of § 841(b)(1)" and instead held that "[t]he language Congress enacted requires death to 'result from' use of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed." Id. at 891.

Moreover, other courts and judges have disagreed about the meaning of § 841(b)(1)(C)'s text, demonstrating that the meaning of "results from" is not clear without further explanation. Before the Supreme Court granted certiorari and reversed in *Burrage*, the Eighth Circuit had affirmed the defendant's conviction in that case, holding that the district court had not erred in instructing the jury that "results from" meant that the controlled substance must have been a "contributing cause" of the death. Id. at 886. Moreover, in a separate opinion in *Burrage*, Justice Ginsburg, joined by Justice Sotomayor, explained that she would apply the rule of lenity, a doctrine

34

invoked only where statutory language is ambiguous, in interpreting § 841(b)(1)(C)'s text. See id. at 892 (Ginsburg, J., concurring in the judgment); cf. Bifulco v. United States, 447 U.S. 381, 387 (1980) (recognizing that the rule of lenity "applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose").

Thus, even though the Supreme Court has now clarified the meaning of "results from" by interpreting the phrase's "ordinary meaning," the language of the Controlled Substances Act, without any further instruction, could certainly have confused or misled the laypersons on the jury—just as it has confused many jurists—to the prejudice of Alvarado. Cf. United States v. MacKay, 20 F. Supp. 3d 1287, 1295 (D. Utah 2014) ("In effect the Government asks the Court to find the statutory interpretation skills of the common layperson juror equal to those of Justice Scalia. The Court is unable to make such a finding when this Court, the district court in Burrage, and the Eighth Circuit, all failed to correctly deduce the plain meaning of 'resulting from.'"). In fact, the instructions plainly did confuse the jury in this case, as evidenced by the jury's questions.[3]

---

[3] Although the reconstituted jury reached its decision fairly quickly after the court addressed (or, more accurately, declined to address) its last question, the jury's questions nonetheless illustrated its confusion regarding the "results from" requirement. Further, while the jury's efficiency in (Continued)

35

As we must consider the entire jury charge and the record as a whole in assessing whether the jury instructions were adequate and not misleading, see Kivanc, 714 F.3d at 794; Herder, 594 F.3d at 359, I also note that counsel on both sides and testifying witnesses made statements throughout the trial that easily could have led the jury to question the applicable causation requirement. For instance, during direct examination of Dr. Gayle Suzuki, the government asked, "Did the Diphenhydramine [i.e., Benadryl] contribute to Eric Thomas' death?" before clarifying, "So neither the alprazolam [i.e., Xanax] or Diphenhydramine, even though they were there at the same time, contributed to Eric Thomas' death[?]" J.A. 621. While these questions might be viewed as probing the independent sufficiency of the heroin in causing Thomas's death, this phrasing could certainly have prompted the jury to believe that the proper inquiry was which drugs did or did not "contribute[] to" Thomas's death.

Likewise, during closing arguments, the government repeatedly emphasized Dr. Suzuki's testimony that Xanax "played no role in [Thomas's] cause of death." J.A. 689. As the

reaching a verdict might indicate that the jury promptly concluded that the statutory language required a finding of independent sufficiency or but-for causation, it could just as easily demonstrate that the jury quickly concluded that "results from" required only contributory causation.

36

government explained, Dr. Suzuki had maintained that "[t]he Xanax and diphenhydramine played absolutely no role in this death.   It was the heroin."   <u>Id.</u>   Indeed, during cross-examination, Dr. Suzuki described her determination that, even though Thomas had had Xanax in his system when he died, the Xanax had not "contributed or helped him to die."  J.A. 630.  As above, although the government might have intended to elicit and emphasize these statements to highlight the independent sufficiency of the heroin in causing Thomas's death, these comments could also have signaled to the jury, even unintentionally, that it must determine which substances may or may not have contributed to, or played a role in, Thomas's death.   And a simple "but for" instruction could have readily dispelled this possibility; sometimes saying less is not the best course of action.   Even though the government also highlighted Dr. Suzuki's testimony that Thomas would not have died had he not ingested heroin (recalling Dr. Suzuki's opinion that the heroin was a but-for cause of death), the government's questions of witnesses and statements during closing arguments did not make clear to the jury that one standard of causation was more appropriate than another.[4]

---

[4] The government was not alone in making statements that likely confused the jury as to the proper standard for determining whether heroin actually caused Thomas's death.   In
(Continued)

37

While it is not specifically the responsibility of counsel, and certainly not that of an expert witness, to inform the jury of the applicable legal standard, we must consider the whole record, including these statements throughout trial, in assessing whether the district court's jury instructions were adequate and not misleading. By failing to provide any clarifying instruction on the meaning of "results from" before the jury retired to deliberate or, of even greater significance, in response to the jury's subsequent questions highlighting the jury's manifest struggle with the statutory requirement of causation, the district court did not alleviate any jury confusion that had arisen during the trial, and its limited instructions likely perpetuated this confusion.

D.

It is of no moment that the district court declined to elaborate on the meaning of "results from" in an effort to avoid the risk of causing further jury confusion. In explaining the rationale behind its decision to adhere to the text of § 841(b)(1)(C) in its instructions, the district court

---

her closing arguments, defense counsel stated that the jury would need to "determine whether the death resulted from heroin, whether the death resulted from Xanax, [or] whether it resulted from the combination of the different drugs," without clarifying whether a guilty verdict would be more or less appropriate on any one of these bases. J.A. 718.

38

emphasized that it found persuasive the Seventh Circuit's decision in United States v. Hatfield, 591 F.3d 945 (7th Cir. 2010) (Posner, J.). The court in Hatfield had explained that "[e]laborating on a term often makes it less rather than more clear" and noted that "[p]robably the same is true of 'results from.'" Id. at 949–50. To be sure, as the Supreme Court had not yet decided Burrage at the time of Alvarado's trial, the district court had little guidance on how best to instruct the jury on the phrase's meaning, especially since courts were so divided on the issue. Nevertheless, the question before us is whether the instructions that the court provided, in light of the entire jury charge and the record as a whole, "adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." Kivanc, 714 F.3d at 794 (quoting Noel, 641 F.3d at 586). It is therefore irrelevant that the court might have had difficulty providing more specific instructions.

In light of the Supreme Court's holding in Burrage that § 841(b)(1)(C) requires a finding that use of the controlled substance was an independently sufficient or but-for cause of death, the district court's instructions, which merely directed the jury to determine whether death "resulted from" the use of heroin, were insufficient, no matter how well intended. See Moye, 454 F.3d at 398 ("By definition, a court 'abuses its

39

discretion when it makes an error of law.'" (quoting Prince-Oyibo, 320 F.3d at 497)). Thus, based on the record in this case, I would hold that the jury instructions did not "adequately inform[] the jury of the controlling legal principles without misleading or confusing the jury," Kivanc, 714 F.3d at 794 (quoting Noel, 641 F.3d at 586), and the district court abused its discretion in providing these limited instructions.[5]

---

[5] By the same logic, I would hold that the district court's decision to limit its instruction on causation to the "results from" language of the statute was also plain error were it necessary to apply that standard of review. To satisfy the plain error standard, a defendant must show that "(1) an error was made; (2) the error is plain; and (3) the error affects substantial rights." United States v. Massenburg, 564 F.3d 337, 342–43 (4th Cir. 2009) (citing United States v. Olano, 507 U.S. 725, 732 (1993)). The third prong typically "means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." Olano, 507 U.S. at 734.

Before the judgment against Alvarado became final, the Supreme Court held in Burrage that it is reversible error for a district court to instruct a jury in a manner that allows the jury to find that "death resulted" under § 841(b)(1)(C) based on a determination that the substance the defendant distributed merely contributed to the death. As the jury instructions in this case did not foreclose the possibility that the jury would convict upon finding contributory causation, the instructions were erroneous, and the error in this case was plain at the time of appellate review. See Henderson v. United States, 133 S. Ct. 1121, 1124–25 (2013) ("[A]s long as the error was plain as of . . . the time of appellate review . . . the error is 'plain' within the meaning of [Federal Rule of Criminal Procedure 52(b)]."). Further, as demonstrated throughout this opinion, Alvarado has shown that the error was prejudicial, as it likely influenced the jury's determination that "death resulted" from the heroin that Alvarado distributed, affecting the outcome of
(Continued)

40

II.

The majority concludes that, despite the potential for error in giving such limited jury instructions on § 841(b)(1)(C)'s "death results" requirement, no such error occurred in this case because the record unequivocally demonstrates that heroin was an independently sufficient or but-for cause of Thomas's death. In other words, the majority essentially determines that the jury instructions in this case could not have misled or confused the jury "to the prejudice of the objecting party." Id. (quoting Noel, 641 F.3d at 586). As I have already determined that the district court's instructions were erroneous on the record before us, I explore whether prejudice may have resulted from that error.

A.

When a district court "erroneously instructs the jury on an element of the offense, the error may be disregarded as harmless if a reviewing court can determine, beyond a reasonable doubt, that a correctly instructed jury would have reached the same conclusion." United States v. Hastings, 134 F.3d 235, 241 (4th Cir. 1998). In other words, the relevant inquiry is whether it

the trial. See Olano, 507 U.S. at 734–35 (recognizing that the defendant bears the burden of establishing that plain error was prejudicial). Thus, the district court committed plain error in providing these jury instructions.

41

is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." Neder v. United States, 527 U.S. 1, 15–16 (1999); United States v. Brown, 202 F.3d 691, 699 (4th Cir. 2000).

Because the jury instructions in this case allowed the jury to convict Alvarado based on a misinterpretation of an element of the charge—that is, based on a belief that § 841(b)(1)(C)'s "death results" element[6] merely required that the heroin "contributed to" Thomas's death—and because the record does not foreclose the possibility that a rational jury might have done so, I would hold that the error was not harmless. Stated differently, I cannot conclude beyond a reasonable doubt that a rational jury given the correct instructions would have reached the same outcome.

It is important to note that, while the government bears the burden of proving harmlessness, United States v. Lovern, 293 F.3d 695, 701 (4th Cir. 2002), the government failed to address this issue at all in its briefing. It contends only that the jury instructions were adequate without suggesting what results

---

[6] Burrage made clear that, "[b]ecause the 'death results' enhancement increased the minimum and maximum sentences to which [the defendant] was exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt." 134 S. Ct. at 887 (citing Alleyne v. United States, 133 S. Ct. 2151, 2162–63 (2013); Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)).

42

if we find otherwise. Thus, the government has failed to establish that the district court's instructional error was harmless beyond a reasonable doubt, and we could vacate Alvarado's conviction under § 841(b)(1)(C) on this basis. Nevertheless, I will explore the issue further for the sake of completeness.

B.

Although Dr. Suzuki testified that, in her expert opinion, heroin intoxication was the cause of Thomas's death, and she essentially testified that the heroin was both an independently sufficient and but-for cause of death, other evidence presented at trial could have led a rational jury to conclude that heroin was merely a contributing factor. To begin, the record contained evidence suggesting that heroin was not independently sufficient to have caused Thomas's death. For instance, Thomas's fiancée, Monica Shaugnessey, testified that Thomas had ingested heroin on a daily basis and had done so for years prior to his death. In 2011, Thomas purchased and ingested between five and ten bags of heroin each day, and the day he died was no exception. Yet he had only previously suffered cardiac arrest and stopped breathing when he injected a combination of heroin and Xanax, as he did when he died. This history suggests that heroin alone was likely insufficient to have caused Thomas's death.

43

It is also significant that the morphine in Thomas's system from his ingestion of heroin was found to be at a toxic, not lethal, level. J.A. 619. In other words, it was at the level where the substance may "start doing damage to the body, harming certain systems in the body," but it had not reached the level "associated with knowing [the substance] to have caused death." J.A. 579. Further, Thomas had likely developed a high tolerance for heroin such that he could have ingested much more of the drug before truly reaching a level that was toxic to him. Both doctors who testified at trial stated that they had found the morphine in Thomas's system to be at a toxic level based on standard charts that do not account for an individual's particular tolerance for the substance. This evidence supports the conclusion that the heroin in Thomas's system, while harmful, was not an independently sufficient cause of his death.

The record also does not contain uncontroverted evidence that heroin was a but-for cause of Thomas's death. Shaugnessey testified that Alvarado had only recently begun injecting a combination of Xanax and heroin and that doing so prompted severe reactions in Alvarado: "His new thing was to mix them together and that will kill you and he knew this." J.A. 415.

It is unclear, however, that Thomas's injection of Xanax alone[7] or in combination with Benadryl—even at the relatively low levels that Thomas used these substances–could not have caused his death.  Dr. David Burrows, the forensic toxicologist, testified that <u>injecting</u> a substance rather than orally ingesting it causes the drug to have a faster additive effect. J.A. 596.  He also stated that mixing Xanax and Benadryl, which are both central nervous system depressants that can affect a person's breathing and heartbeat, can have "additive to synergistic effects" as the two drugs "compound[]" and "aggravate" one another.  J.A. 589–90.  Dr. Suzuki corroborated this testimony, as she confirmed that mixing Xanax and Benadryl together can have an "adverse effect."  J.A. 593.

Finally, the jury was free to assess the credibility of Dr. Suzuki's testimony and disregard it if the jury found it unreliable.  Indeed, the jury was specifically instructed on this point:  "Expert testimony should be considered just like any other testimony.  You may accept or reject it, and give it as much weight as you think it deserves. . . .  The same as with any other witness, it is up to you to decide whether to rely

---

[7] While Dr. Suzuki did indicate that, in her expert opinion, the relatively low level of Xanax in Thomas's system would have been insufficient to have independently caused his death, she did not speak to the effect that Thomas's intravenous injection of the substance may have had.

45

upon it." J.A. 935. Accordingly, simply because Dr. Suzuki's testimony suggested that heroin was an independently sufficient and but-for cause of Thomas's death did not preclude the jury from concluding otherwise and convicting on an alternative basis. Thus, I cannot conclude beyond a reasonable doubt that a rational jury would have reached the same outcome had it received a proper instruction. Rather, a rational jury could certainly have concluded, based on the record, that the use of heroin was neither an independently sufficient cause nor a but-for cause of Thomas's death and improperly triggered § 841(b)(1)(C)'s penalty enhancement upon finding that heroin merely "contributed to" Thomas's death.

In determining otherwise, the majority indicates that "[t]here was no evidence in the record that Thomas could have died without the heroin" and that "no party suggested that, even without the heroin, Thomas would have died." Ante at 2, 14. These considerations appear to impermissibly shift the burdens of proof and persuasion to Alvarado, the criminal defendant. See Sullivan v. Louisiana, 508 U.S. 275, 277–78 (1993) ("The prosecution bears the burden of proving all elements of the offense charged and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." (emphasis added) (citations omitted)); see also In re Winship, 397 U.S. 358, 359–64 (1970) (discussing the

46

"vital" and "indispensable" nature of the government's burden to prove guilt of a criminal charge beyond a reasonable doubt).

Alvarado had no duty to present evidence that the heroin he was charged with distributing merely contributed to Thomas's death; nor did he have any responsibility to argue that Thomas would have died absent the heroin. Rather, the government bore the burden of proving beyond a reasonable doubt that the heroin Alvarado distributed was an independently sufficient or but-for cause of Thomas's death. The only evidence that the government presented on this matter was Dr. Suzuki's testimony, to which the jury was free to assign little weight or reject entirely based on its determination of Dr. Suzuki's credibility. Further, even though Alvarado had no duty to present evidence, the record <u>did</u> in fact contain evidence, including Shaugnessey's and Dr. Burrows's testimony, that could well have led a rational juror to conclude that the heroin was neither an independently sufficient cause nor a but-for cause of Thomas's death. Accordingly, I would hold that the erroneous instruction was not harmless beyond a reasonable doubt.

And there is one additional consideration in this case worthy of notice that bolsters the claim of prejudice. The indictment in this case contained but one count, that alleging a violation of § 841(b)(1)(C), the death count. The indictment contained no separate count for mere distribution of heroin.

47

Thus, given the manner in which the government elected to charge and present the case, the jury was faced with a choice of either acquitting an avowed drug trafficker or throwing up its hands and convicting after its repeated requests of the court for clarification of the causation requirement were rebuffed. Cf. supra n.3. In the face of the court's serial refusals to provide the help the jury was desperately seeking, few laypersons would be willing to say "not proven" and return a verdict in favor of the drug dealer.

III.

For the foregoing reasons, I would vacate the judgment of conviction under § 841(b)(1)(C) and remand with instructions that Alvarado either (1) be accorded a new trial or (2) be resentenced without a new trial on the lesser included § 841(a)(1) distribution offense. Cf. United States v. Hickman, 626 F.3d 756, 760 (4th Cir. 2010); see also United States v. Blue, 808 F.3d 226, 237 (4th Cir. 2015) (recognizing that "it is within our power to direct entry of judgment on a lesser included offense when vacating a greater offense" if the commission of the lesser offense "can be established from facts that the jury actually found" (citations omitted)); United States v. Ford, 750 F.3d 952 (8th Cir. 2014) (finding insufficient evidence of causation and remanding for resentencing on lesser included drug offense). I agree with the

48

majority's determination that no other error infected the proceedings in this case.